S

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
3:00CV-326-R

AFTERMARKET TECHNOLOGY CORP., et al.

PLAINTIFFS

v.

WHATEVER IT TAKES TRANSMISSIONS,
KENNY HESTER, CHARLES BOWMAN, CHARLES
LITCHFIELD, WILLIAM WATTS, JOHN LEECH, and
KIMBERLY NICKS HALL,

DEFENDANTS

## MEMORANDUM AND ORDER

The Plaintiffs, including ATC Distribution Group ("Aftermarket"), have moved for

partial summary judgment (Dkt # 126); Defendants Whatever It Takes Transmissions ("WITT")

and Kenney Hester have filed motions for summary judgment (Dkt # 118);  Defendants Charles

Bowman, Charles Litchfield, William Watts, John Leech and Kimberly Nicks Hall (collectively

"the North Carolina Defendants") have also filed for summary judgment (Dkt #119).  All parties

have responded and replied to these motions, which are now ripe for decision.

For the reasons outlined below, Aftermarket's motion for partial summary judgment is

**GRANTED IN PART** and **DENIED IN PART**.  The Defendants' motions for summary

judgment are **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

The disputes among Aftermarket and the Defendants center on three areas: the

relationship between Aftermarket and Kenney Hester; the relationship among Aftermarket,

1

Kenny Hester, and the North Carolina Defendants; and, WITT's use of Aftermarket's part numbers. This Court will briefly detail each.

## I. KENNY HESTER AND AFTERMARKET

This case began with the merger of two companies in 1994. Aftermarket Technology Group, the Plaintiff's predecessor-in-interest, bought Hester Transmission Parts ("HTP"). Along with HTP, Aftermarket acquired the services of Defendant Kenny Hester, Mike Hester, and all of the North Carolina Defendants, who had worked at HTP for varying amounts of time. Aftermarket also received HTP's old building, which it continued to use. Finally, it also received use of HTP's transmission parts catalogue, which HTP bought from McCarty, a professional printing company that sold transmission parts catalogues to distributors for their use.

As a part of the sale of his company to Aftermarket, Defendant Hester signed an employment contract and an agreement not to compete with Aftermarket from August 2, 1994, until August 2, 1999, including his promise not to solicit any employees. In 1997 Aftermarket went through a corporate reorganization that included merging its wholly-owned subsidiaries, including HTP, into the ATC Distribution Group, which is the Plaintiff in this case.

By 1998 Aftermarket's business had deteriorated and Defendant Hester grew anxious to leave the company. By June of that year, Defendant Hester informed Aftermarket's then-president, Wes Dearbaugh, that he intended on leaving Aftermarket's employ after the expiration of his non-competition agreement. As an internal company document, dated June 4, 1998, explained: "For example, Kenny Hester had originally planned to stay with ATC 5 years after he sold his business or until the end of 1999. Kenny has decided with these [organizational] changes, it is time for him to begin to pull away from the day-to-day regional business and help

2

us on broader goals for the group such as increasing our converter business and our new reman transmission business." (Dkt # 124, Ex. 3 at 1.)

Sometime before December, 1998, Hester decided to return to the transmission parts distribution after August, 1999.  Hester testified that by February, 1999, he told Dearbaugh and Aftermarket's new CEO, Mike Dubose, about his intention to leave Aftermarket, purchase two standard (manual) transmission parts distributors, merge them, and begin operations.[1]  His intention was definitely known to Dubose and others at Aftermarket by July 13, 1999, when Dubose exchanged emails regarding Hester's potential departure with one of his other employees.

In June, 1999, Hester met with an attorney to discuss his planned departure from Aftermarket.  In July, he purchased a forklift and some shelving units to use if he completed his purchase of the manual transmission parts distributors.  (At some point, Hester swapped shelving units with Aftermarket.)

Hester, after speaking with Dubose, agreed to stay with Aftermarket until October, 1999.  On August 18, 1999, he gave written notice that he would resign on October 16, 1999.  After tendering this notice, Hester obtained a proposal from a computer systems vendor and filed an application for Kentucky Job Development Act tax credits.  Hester testified he told Dubose of this latter step.  He also, about this time, entered into negotiations to purchase one of the standard transmission parts distributors.  Hester began minor renovations on the building which he owned (from which HTP and Aftermarket had operated for a while) with the help of some other

---

[1]Hester testified that he did not approach the owners of the manual transmission parts distributors until after the expiration of his non-compete agreement because he feared that Aftermarket would hold that against him.

Aftermarket employees, who he paid as part-time help.  After further consultation, Hester resigned effective September 17, 1999.

Hester's negotiations to purchase the manual transmission parts distributors failed.  In response, Hester prepared to open the automatic transmission parts distributor that became Defendant Whatever It Takes, Transmissions ("WITT").  During November, 1999, Hester began purchasing inventory and speaking with vendors.[2]  He also hired Richard Skaggs, a long-time employee of both HTP and Aftermarket.  Skaggs had, at one point, served as a branch manager for Aftermarket.

Hester placed a "help wanted" advertisement in the *Pioneer News* seeking employees.  In response, many of Aftermarket's employees in Louisville filed employment applications with what would become WITT.  Aftermarket subsequently fired its entire Louisville workforce, but offered each of them a severance package if they would sign a one-year noncompete agreement.  These employees, or at least a significant number of them, declined to sign the noncompete agreement; instead, Hester hired them to work at WITT, which was incorporated in December, 1999, and began processing sales in January, 2000.

WITT used advertising which incorporated Aftermarket's part numbers.  It also produced a flyer that indicated that WITT was "formerly HTP," although the distribution and impact of that flyer is unclear.

## II. THE NORTH CAROLINA DEFENDANTS

In January, 2000, Hester went to Charlotte and met with the North Carolina Defendants

---

[2] About this time, Hester also obtained, at his request, the same phone number that HTP had used prior to its purchase by Aftermarket.

4

and other Aftermarket employees who had formerly worked at HTP.[3]  Hester testified that these employees "confirmed their interest" in leaving Aftermarket to return to work with Hester, but he offered them no employment at that time.

Hester went to Charlotte after speaking with Defendant Watts sometime in December, 1999, about the possibility of WITT opening a Charlotte branch.  After hearing from Hester that WITT would expand into the Charlotte market after Louisville's branch was operational, Watts began helping Hester locate a building in Charlotte for the WITT branch.  Watts began his search during January 2000, during his non-working hours.  With the help of Defendant Leech, Watts located a building and informed Hester of its availability.  Hester signed a lease for that building on March 23, 2000.

In late March, 2000, the North Carolina Defendants resigned en masse from Aftermarket's Charlotte branch and began work at WITT.  Their complaints and concerns about Aftermarket's customer service and business positions had begun no later than 1999.  After WITT began serious preparation for opening its Charlotte branch, on March 27, 2000, Defendants Watts and Litchfield resigned from Aftermarket. The next day, the remaining North Carolina Defendants resigned, leaving immediately on Aftermarket's request.

When the North Carolina Defendants left work at Aftermarket they took with them copies of customer lists, reports of accounts receivable – some recent, some dating from early 1998 – and reports detailing the pricing groups to which Aftermarket assigned its customers.  After they began work at WITT, Defendants Leech and Litchfield sent letters to their old customers explaining their move.  Defendants Hall, Watts and Litchfield also called some of their former

---

[3]All the North Carolina Defendants had worked for HTP since, at the latest, 1991.

customers.

One portion of Defendant Bowman's background differs from those of his fellow North Carolina Defendants. In 1991, Defendant Hester promoted Bowman to "Vice President and Sales Manager," a position for which Bowman signed a contract containing non-compete and non-solicitation clauses. In July, 1992, Bowman and HTP agreed that Bowman should return to his original position as a salesman. His compensation shifted commensurate with his job changes – from a fully commission-based compensation system to one including a weekly salary back to a fully commission-based system.

## III. THE CATALOGUES AND PART NUMBERS

Defendant Hester began his service to Aftermarket as President of HTP. In that role, he continued work on a parts catalogue and numbering system that had begun prior to the sale. Aftermarket's then-CEO, William Smith, directed Defendant Hester to continue his work in hopes that the new Aftermarket catalogue would become the industry standard. The fruits of this labor were first published in 1995 as the RPM/HTP "Transmission Components Catalog." These catalogues were distributed throughout the industry, including Aftermarket's competitors.

Aftermarket's part number system and catalogue drew from preexisting sources in the industry. McCarty, a technical business publisher, had published a part number catalogue that it distributed among many different wholesalers – each with their own name on it – based on a similar part numbering system, which the Aftermarket authors had used as a basis for their own system. Also, Aftermarket secured illustrations for its catalogue by duplicating images of transmissions found in other distributor's catalogue and rearranging them in a manner consistent with the assembly and disassembly of a transmission. Aftermarket's catalogue was originally

published without a copyright notice, but subsequent additions, including one in 1999, included such notice.

After Defendant Hester left Aftermarket in September, 1999, he obtained from an Aftermarket customer an electronic copy of the 1999 Aftermarket catalogue, which he used to create a catalogue used by WITT salespeople. Pages from that catalogue have been distributed to customers in a few instances, but according to Defendant Hester's affidavit, fewer than forty copies have been produced and the entire catalogue has never been distributed outside of WITT. However, WITT uses many of Aftermarket's part numbers in some advertisements and in its own internal processes.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of the evidence. To support his position, he must present evidence on which the trier of

7

fact could find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, Ky., 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## ANALYSIS

### I.
### COUNT ONE: COPYRIGHT INFRINGEMENT UNDER § 17 U.S.C. 501

The first count of the Third Amended Complaint alleges that WITT and Defendant Hester "knowingly and wilfully [copied] without authorization ATC DG's copyrighted works." (Dkt #191 at 19.) Aftermarket complains of specific infringement of "ATC DG's Part Numbers, Catalogs and the Taxonomy, by preparing derivative works thereon, by distributing to the public advertising, product brochures, catalogs, reference guides package and/or price lists." *Id.* Of particular concern here is the protected status of Aftermarket's part numbers, the compilation of those part numbers, and the illustrations accompanying the part numbers in its catalogue.

The Constitution establishes Congress's power to create copyrights to protect intellectual work. Const. Art. I, § 8, cl. 8 ("To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."). As the Supreme Court explained in *Feist Publications v. Rural Telephone Service Co., Inc.*, 499 U.S. 340 (1991), "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work

8

that are original." 499 U.S. at 361.  The Court further defined originality as

> that the work was independently created by the author (as opposed to copied from
> some other works), and that it possesse[d] at least some minimal degree of
> creativity.  To be sure, the requisite level of creativity is extremely low; even a
> slight amount will suffice.  The vast majority of works make the grade quite
> easily, as they possess some creative spark, no matter how crude, humble or
> obvious it might be.  Originality does not signify novelty; a work may be original
> even though it closely resembles other works so long as the similarity is
> fortuitous, not the result of copying.  To illustrate, assume that two poets, each
> ignorant of the other, compose identical poems.  Neither work is novel, yet both
> are original and hence, copyrightable."

499 U.S. at 345-46 (citing M. Nimmer & D. Nimmer, Copyright §§ 108[C][1], 2.01[A], [B]

(1990)) (quotations omitted).

The Defendants do not contest the allegation that they copied the part numbers, the

compilation of those numbers, or the illustrations.  (Dkt #118 at 12.)  The parties disagree,

however, about whether or not Aftermarket owns a valid copyright in those materials.  The

Defendants argue that Aftermarket abandoned any copyright claim by publishing its catalogue in

1995 without notice, and further that the materials it contained do not meet the constitutional

requirement of originality.  *Feist*, 499 U.S. at 346 ("Originality is a constitutional requirement.").

Aftermarket argues that the part numbers and illustrations are sufficiently original to be protected

on their own or as a "taxonomy" or "compilation."  This Court will first consider the

Defendants' allegation that Aftermarket abandoned its copyright, and then consider in turn

whether the originality in the part numbers, the compilation of the part numbers, and the

illustrations meets the constitutional standard.

## A.  Abandonment

WITT and Hester argue that Aftermarket may not recover because the copyright was

abandoned when Chairman Smith distributed it in 1995. This is incorrect. *See Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.,*871 F. Supp. 709, 720 (S.D.N.Y. 1995) ("The 1909 Act provided that a work had to bear a valid copyright notice upon publication in order to secure copyright protection. In 1976, the Copyright Act was amended to allow a copyright owner to cure its omission of the copyright notice by taking subsequent reasonable efforts to affix notice and registration within five years. The 1976 Act was amended by the Berne Convention Implementation Act of 1988 . . . which eliminated the notice requirement completely. Thus, while the current statute states that a notice of copyright ... may be placed on publicly distributed copies . . .affixing notice is no longer mandatory for works first published after March 1, 1989.") (citations and quotations omitted).

The Defendants in support of their abandonment claim cite *Norma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 48 (5th Cir. 1995). Their brief fails to note, however, that *Norma Ribbon* is simply and obviously distinguishable: "Although since the Berne Convention Implementation Act of 1988 . . . notice is no longer a prerequisite to copyright protection .. . the notice requirement remains in effect for works that predated that Act. The ribbon flowers in this case were distributed publicly before the Act and thus are subject to the notice requirement." *Id.* Here, the catalogue was distributed publicly after the Berne Convention Implementation Act, so Aftermarket's failure to provide notice does not constitute an abandonment of its copyright.

## B. Numbers & Numbering Systems

When determining whether the part numbers are sufficiently creative – and therefore original – to warrant copyright protection, this Court must distinguish between two potential sources of creativity and originality. One potential source is in the creation of the numbers, the

other, in the creation of the system that generates those numbers.  This distinction is critical

because 17 U.S.C. § 102(b) provides that "In no case does copyright protection for an original

work of authorship extend to any idea, procedure, process, system, method of operation, concept,

principle, or discovery, regardless of the form in which it is described, explained, illustrated, or

embodied in such work."[4]

Aftermarket relies heavily on the Seventh Circuit's decision in *American Dental Assoc. v.*

*Delta Dental Plans Assoc.*, 126 F.3d 977 (7th Cir. 1997).  In *American Dental*, the circuit

considered whether or not copyright law protected the American Dental Association's "Code on

Dental Procedures and Nomenclature."  The Code classified the universe of dental procedures

into various groups and assigned each procedure a number, and short and long descriptions.  126

F.3d at 977.  As the panel, per Judge Easterbrook, explained, "[f]or example, number 04267 has

been assigned to the short description 'guided tissue regeneration–nonresorbable barrier, per site,

per tooth (includes membrane removal),' which is classified with other surgical periodontic

services."  *Id.*  Committees of the dental association created these numbers and descriptions.  *Id.*

at 978-79 ("Blood is shed in the ADA's committees about which description is preferable.").

The panel held that "all three elements of the Code – numbers, short descriptions, and long

descriptions, are copyrightable."  *Id.* at 979.

---

[4]This is a basic principle of copyright law, which Aftermarket misstates.  *See, e.g.,* Dkt #
142 at 7 (containing a heading "The Parts Numbering System is Original and Creative" and text
in the following paragraph arguing that "arriving at a unique set of part numbers after 'copying'
four different sets of numbering systems unquestionably evidences a creative undertaking.").
Additionally, even if this Court were to accept Aftermarket's argument that copyright protects its
"part numbering system," the idea of categorizing items by number is hardly original, even in the
transmission parts industry.  The copyright protection must arise from the expressions, i.e., the
numbers, of that system.  *Toro Co. v. R & R Products Co.*, 787 F.2d 1208, 1212 (8th Cir. 1986)
(noting that § 102(b) may protect a "particular expression of that [system.]").

The *American Dental* panel acknowledged that systems cannot be copyrighted, *id.* at 980, but explained that copyright law protected the ADA's code as a "taxonomy." *Id.* at 979-80.[5] "A taxonomy is a way of *describing* items in a body of knowledge or practice." *Id.* at 980 (emphasis in original). It compared taxonomies to maps and other means of usefully organizing facts. *Id.* at 979-80. In further explanation:

> Facts do not supply their own principles of organization. Classification is a creative endeavor. Butterflies may be grouped by their color, or the shape of their wings, or their feeding or breeding habits, or their habitats, or the attributes of their caterpillars, or the sequences of their DNA; each scheme of classification could be expressed in multiple ways. Dental procedures could be classified by complexity, or by the tools necessary to perform them, or by the parts of the mouth involved, or by the anesthesia employed, or in any of a dozen different ways. The Code's descriptions don't "merge with the facts" any more than a scientific description of butterfly attributes is a part of the butterfly.

126 F.3d at 979.

The protection copyright law gives to the long and short descriptions found in the ADA's code is unquestioned, but Judge Easterbrook's explanation of why the numbers deserve copyright protection is problematic. He writes:

> The number assigned to any one of the three descriptions could have had four or six digits rather than five; guided tissue regeneration could have been placed in the 2500 series rather than the 4200 series; again any of these choices is original to the author of a taxonomy, and another author could do things differently. Every number in the ADA's Code begins with zero, assuring a large supply of unused numbers for procedures to be devised or reclassified in the future; an author could have elected instead to leave wide gaps inside the sequence. A catalog that initially assigns 04266, 04267, 04268 to three procedures will over time depart substantively from the one that initially assigns 42660, 42670, and 42680 to the same three procedures.

---

[5] Judge Easterbrook declaimed any reliance on protection by compilation. 126 F.3d at 980 ("Note that we do *not* conclude that the Code is a compilation . . .. It could be a compilation only if its elements existed independently and the ADA merely put them in order."). This Court will address the possibility that Aftermarket copyrighted a compilation shortly.

*Id.* at 979. In other words, the *American Dental* panel found the numbers involved to be descriptions in the same way that the long or short ones were, and thus protected under copyright law.[6]

The *American Dental* decision is troublesome for two reasons. First, taxonomies are, "in effect, methodologies for breaking down the information relevant to particular branches of knowledge into organized pieces." Dennis S. Karjala, *Distinguishing Patent and Copyright Subject Matter*, 35 Conn. L. Rev. 439, 495 (2003). As such, taxonomies fall into the category of "useful articles," and, as Professor Karjala explained, the *American Dental* panel "failed to analyze correctly the implications of *Baker v. Selden* for useful articles . . . . The availability of a variety of ways for classifying dental procedure information should not make a particular choice copyright protectable any more than the availability of a large number of accounting systems made Selden's particular system protectable." *Id.* at 498.[7] Judge Easterbrook's comparison of maps and taxonomies makes this point plain: "Like taxonomies, maps are valued to the extent they offer useful organizations of facts." 126 F.3d at 978-79. However, clearly a copyright on a

---

[6]If anything, the descriptive function of the numbers seems more akin to the sort of intellectual property traditionally protected by trademark law. *See infra* pages 21*ff.*

[7]The accompanying footnote also contains a useful example:
> Simpler taxonomies make these points more obvious. Thus, a four-part classification system for women's bodies, denominated H-O-A-X and used as an organizing principle for a book of fashion suggestions, was not infringed by a book whose author adopted the same classification system for a fashion reference book, at least where the same letters were not used to describe the different body types and the classification system was not used as an organizing principle.

*Karjala*, 35 Conn. L. Rev. at 498 n.243 (citing *Duffy v. Penguin Books USA, Inc.*, 4 F. Supp.2d 268, 273 (S.D.N.Y 1998). This Court will consider later whether or not a system which, in effect, uses the same letters (or, in this case, numbers) can be protected under copyright. *See infra* pages 16*ff.*

13

map does not extend to the principles of classification that it embodies – otherwise, only one map – the first to obtain a copyright – could organize its contents by latitude and longitude.

The second problem with *American Dental* is its rejection of compilation analysis, noted previously. It rejects compilation analysis because it "could be a compilation only if its elements existed independently." 126 F.3d at 980. This seems to be a misreading of the statute, which also defines compilations as collections of "data." 17 U.S.C. § 101. The ADA's code numbers and descriptions are independent data subject to compilation analysis.

The Third Circuit considered issues similar to those raised presently in *Southco, Inc. v. Kanebridge Corp.*, 258 F.3d 148 (3d Cir. 2001). In that case, the panel held that part numbers which served "as a shorthand description of the relevant characteristics of each fastener" were unprotected by copyright. 258 F.3d at 149. The panel, per Judge Alito, held that "the creative spark is utterly lacking in Southco's part numbers and that these numbers are examples of works that fall short of the minimal level of creativity required for copyright protection." *Id.* at 152. "Southco unquestionably devoted time, effort, and thought to the creation of the numbering *system*, but Southco's system makes it impossible for the numbers themselves to be original. Under that system, there is simply no room for creativity." 258 F.3d at 153. The panel distinguished language from a Tenth Circuit case and a Eighth Circuit case which the district court had used to support its finding that Southco's part numbers were copyrightable. 258 F.3d at 153-54 (distinguishing *Toro Co. v. R & R Products Co.*, 787 F.2d 1208 (8th Cir. 1986) on the grounds that it analyzed the creativity under the defunct "sweat of the brow" theory and *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366 (10th Cir. 1997) on the grounds that creativity in creating the physical specifications underlying the part numbers does not equate to creativity in creating in the

14

numbers.).  The panel also distinguished Southco's part numbering system to the taxonomy

protected in *American Dental*.  It reasoned that the ADA's code numbers "were not chosen

randomly . . . [but] reflected creative thought."  258 F.3d at 155-56.  In particular, the

categorization of different procedures appeared to impress the panel.  *Id.* at 156.

On remand, the *Southco* district court granted summary judgment in favor of the

defendant on the grounds that the Third Circuit had concluded as a matter of law that the part

numbers were unprotected under copyright.  *Southco, Inc. v. Kanebridge Corp.*, 324 F.3d 190,

194 (3d Cir. 2003) ("*Southco* (II)").[8]  On appeal, a different Third Circuit panel reversed the

district court's ruling and remanded the case for further consideration.  The second *Southco* panel

found it significant that Southco had submitted a declaration from one of its inventors which

described the rather arduous process he undertook when assigning a part number to a new

"enclosed retractable captive screw."  *Id.* at 193.  The second panel concluded that the first

panel's decision was based on the "mechanistic application" theory and that the district court was

entitled to consider, in light of *American Dental*, the declaration describing a process that

contained "at least a modicum of creativity."  *Id.* at 197.

This Court need not decide among the two interpretations offered by the Third Circuit

because under either approach Aftermarket's part numbers lack the spark of creativity required

for copyright protection.  *Southco* (II) describes a part numbering process which, by the

inventor's own admission, is no real process at all.  As the *Southco* (II) panel cited from his

---

[8]Subsequent to its issuance the Third Circuit has decided to hear the *Southco* (II) decision *en banc*.  This casts doubt on the latter decision's validity, especially in light of the "law of the case" doctrine. Because this Court looks to the Third Circuit for persuasive authority only, however, analysis of *Southco* (II) is helpful here.

declaration:

> These numbers were not dictated by any numbering system. Not only each part number as a whole, but each group of digits and each digit in each number was created by me based upon the specific products which I had created and my determination of the values of those products to be represented and the digits to be used. The part number for each new part was created on the basis of my decision.

*Southco* (II), 324 F.3d at 193-94. What this declaration describes is not a system, but a series of *ad hoc* decisions made by a product's inventor about what the product number should be. It also does not address the question of whether the product numbers, as opposed to the ideas embodied in the product numbering system, are sufficiently creative to deserve copyright protection.

The consideration of this question in light of Aftermarket's actual system is useful. Aftermarket submitted an affidavit from John Hesch, who was "one of the three individuals primarily responsible for the design of the ATCDG catalog and creation of the parts numbering system." (Dkt #202, Aff. ¶ 2.) Hesch's affidavit describes the part numbering system as containing "two or more of the following four field components: 1) an optional one or two letter prefix field, 2) a two or three digit transmission field . . ., 3) a three digit part field . . ., and 4) an optional one or more letter or number suffix field that may contain further information." (Dkt #202, Aff. ¶ 7.)[9] Taking each field in order, Hesch describes what he considers to be the creativeness present in each:

> 9. The prefix field usually designates a particular brand, but may designate other information. Creative judgment was used in deciding what information warrants designation within the prefix field of the ATCDG parts

---

[9]The Defendants object to Aftermarket's tendering of this affidavit on the grounds that it conflicts with previously-given deposition testimony. (Dkt #207.) For reasons that will become apparent, this Court will credit the affidavit as an accurate portrayal of the part numbering system in a light most favorable to Aftermarket. Should this Court reconsider the copyright analysis at a later date it will then revisit the issue of the affidavit's admissibility.

numbering information.

10. Within the second field of the ATCDG taxonomy (which designates a transmission type) the second or third digit of the field is often, but not always, employed to convey additional information content. For instance, for Ford transmission types, the ATCDG taxonomy uses a second or third digit designation of "6," whereas for Chryslers the second or third digit is "2." However, due to the constraints of forcing a large variety of transmissions into a two or three digit field, some transmission fields with the second or third digit of "2" are not Chrysler transmissions, but are other transmission types. Thus, all Chryslers are consistently "2"s, but "2"s are not always Chryslers.[10]

11. Similarly, the choice of the number of digits in the second field of the ATCDG taxonomy also reflects creative judgment and thought regarding the present and future significance of the transmission type in the parts markets. A three digit designation in the second field of the ATCDG taxonomy, usually reflects ATCDG's judgment that the transmission type is less prominent in the market, or alternatively that, in order to maintain the second or third digit manufacturer consistency described above, a three-digit number has been employed to accommodate an additional transmission type.

12. In the ATCDG taxonomy, numbers in the third field, which is used to designate part components, are assigned by selective and creative judgments as to 1) the potential for future, currently unknown transmission parts (leading to numerous "gaps" in the designations, 2) the need for cross-transmission type consistency in part identification (leading to "gaps" within transmission types, e.g., there is no "550" part for a 350c transmission, because it does not have an overdrive drum. An A4LD transmission type employs an overdrive drum, and thus the "550" part number is reserved for that part type), and 3) the importance of the given part type or the greater range of part types within the transmission part market so that higher priority parts would appear more prominently in the catalog with lower designations

---

[10]This Court must note that there is nothing creative – even in the context of a system or taxonomy – about the idea that "all Chryslers are consistently '2's but '2s' are not always Chryslers." This represents a logical truism conveying that the descriptive category "2" may contain Chrysler transmissions as well as other sorts of transmissions. It does not embody creative choice unless Aftermarket asserts that Chryslers may also be "1"s or "3"s or "5"s, or that one of the types of transmissions that share the descriptive category of "2" with Chrysler may also be found in "1," "3," or "5." Then, at least, the decision of whether or not a new Chrysler transmission belongs in a particular category might be creative, even if left unprotected by copyright law.

13.  While ATCDG has attempted to obtain consistency within transmission part designations (especially once designations have been made), the original and initial designation of a new part is not a simple mechanical process; rather, it necessarily involves the exercise of creative judgement.  For instance, a novel transmission part type, a 700 R4 "Sure Cure"(tm) kit, was recently designated by ATCDG and that part type could have been designated, in theory, in one of several numerical positions.  It could have been designated as a 507 part (pump components), a 741 part (valve body components), a 927 part (one-two accumulator pistons), but ATCDG chose to give it a new designation of 174, which is now designated for "SureCure"(tm) kits.  In deciding the part number o be assigned ATCDG exercises creative judgment–just as it did in the original designations.

14.  The suffix field is generally a one or two letter field which has no general consistency across part types, but is used for sub-classifications within a given part type.  The suffix identifies variations within the type that, in the judgment of the creators of the taxonomy, are not significant enough to justify the designation of separate part numbers. (E.g., minor variations that have occurred across specific transmission types and production years).

15.  As an example of how the system works in the designation of a part number, a transmission kit containing a rubber gasket set with rings and seals designed for a Turbo Hydramatic 350 transmissions was assigned the designation "44002" under the taxonomy.  This designation only employs the second and third fields, with the "44" indicating a 350 transmission and the "002" indicating the part type.  However, the designation "44002CF" is used if the kit in question is a 1980-86 full ring kit for a 350c transmission.

(Dkt #202, Aff.) There are at least two different types of creativity demonstrated in this description of the part number creation procedure.  One type of creativity addresses the formation of the system, the other, the expression of that system.

There are far more examples of the first type of creativity than there are of the second. Those examples include: decisions about which parts require prefixes or suffixes and the information conveyed in each (¶ 9, 14); determinations of whether one field in the part number should "convey additional information content" (¶ 10); predictions about the present and future importance – or existence – of transmission part types (¶ 11, 12); and, assignation of novel parts

18

to a place within the part numbering system (¶ 13).  Examples of the latter type of creativity

includes the decision of which numbers or letters should be assigned in each of the four part

number subfields to represent the various types of transmission parts available.

 The first sort of creativity – the one associated with designing the part numbering system

– is not protected by copyright law.  First, Aftermarket's competitors may, if they choose, use a

four-subfield numbering system with alphabetical prefixes and suffixes.[11]  Second, the

classification of information into particular subfields is not protected by copyright law, despite

*American Dental*'s holding.[12]  If it were, Aftermarket's part numbers would suffer by

comparison to the numbers they share with McCarty's system.  *Compare* Dkt #124, Ex. 4[D] at 1

(McCarty) *with* Dkt #124, Ex. 4[E] at 4 (Aftermarket).  Third, predictions about the future of

various transmission part types are not protected.[13]  Finally, decisions about which category a

---

[11]Indeed, Aftermarket took advantage of this commonsensical position when it chose to model its part numbers on McCarty's system.

[12] *See supra* pages 13 and 14.  One commentator noted that "the selection of categories for presenting information" is better suited for patent protection than copyright law on the grounds that granting copyright protection for such decisions ignores the systemic effect of protecting choices that turn out to be wrong.  "Recognizing copyright protection in a particular selection of categories runs the risk of preventing improvement by incremental trial and error variations."  Dennis S. Karjala, *Distinguishing Patent and Copyright Subject Matter*, 35 Conn. L. Rev. 439, 487-90 (2003).

[13]For example, suppose an economist publishes an article predicting the Dow Jones Industrial Average will reach 15,000 by 2004.  Copyright law would protect the text of the article (the author's expression of that idea) but it would not prevent others from writing, reporting about, or repeating the original prediction.  *See Harper Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985) ("No author may copyright his ideas or the facts he narrates. 17 U.S.C. § 102(b). *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 726 n. (1971) (Brennan, J., concurring) (Copyright laws are not restrictions on freedom of speech as copyright protects only form of expression and not the ideas expressed).").

new product belongs to are not protected by copyright law.[14]

"A copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea--not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217 (1954). In this case, copyright protection extends only to Aftermarket's decisions about how to express judgments and ideas, not the actual judgements or ideas. The First Circuit's decision in *Lotus Development Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995) explained the distinction as:

> Under the district court's reasoning, Lotus's decision to employ hierarchically arranged command terms to operate its program could not foreclose its competitors from also employing hierarchically arranged command terms to operate their systems, but did foreclose them from employing the specific command terms and arrangement that Lotus had used.

49 F.3d at 816 (cited in *Mitel*, 124 F.3d at 1372).[15]

The expressive component of Aftermarket's part numbers are a series of random and arbitrary numbers and letters – "random and arbitrary" in the sense that they bear little or no relation to the products they are describing; their meaning derives solely from the values assigned them in the part numbering system. Copyright law does not protect this use. As the Tenth Circuit explained, "the random and arbitrary use of numbers in the public domain does not

---

[14]Consider a grocer's decision about where he should put tomatoes in his produce aisle. He may choose to put the tomato with the fruit, as its scientific classification suggests. Or, he may choose to put tomatoes with vegetables, on the theory that most of his customers think of tomatoes as vegetables rather than fruits. Or, he may put tomatoes (if he obtained them from a local farmer) with a selection of other "home-grown" produce. Or he may put tomatoes with a selection of fruits and vegetables commonly grown in gardens. Or he may put tomatoes with other fresh produce that is red. Or, he may choose to create an entirely new display consisting of nothing but tomatoes. Regardless of his choice, copyright law no more prevents other grocers from copying him than it prevents other grocers from selling tomatoes.

[15]The First Circuit went on to conclude that even the expressive choices of those menus were unprotected by copyright law.

20

evince enough originality to distinguish authorship." *Mitel*, 124 F.3d at 1374 (citation omitted);

*see also Southco*:

> We agree with Kanebridge that the values in *Mitel* are not analogous to the part numbers in this case. Instead, they are more closely analogous to the physical specifications of the parts. For example, the number "4" as a description in one of the codes in *Mitel* stood for the value of "40 seconds." This is simply an operational parameter. The number "4" just as easily could have stood for values of "4 seconds," "44 seconds," "83 seconds," or any other amount of time. It was in making this decision that the value should be "40 seconds" that the Mitel employees exercised creativity. At best, this would be analogous to Southco's choosing the length to make a particular fastener. For example, it would be analogous to Southco's deciding between making a particular fastener 200 millimeters or 300 millimeters in length. This is not the same as deciding that the number "2" in its numbering system should represent a fastener that is 632 millimeters.

258 F.3d at 154-55.

This Court finds that under the *American Dental – Southco – Mitel – Toro* line of cases briefed by the parties Aftermarket's part numbers fail to satisfy the originality test the Constitution requires of all copyrights. This Court has also discovered, however, that the Department of Justice and Copyright Office have filed a brief in the *Southco* rehearing *en banc* that calls into serious question the appropriateness of the analysis in all of these cases.

The government's brief states:

> In this case [*Southco*], the carefully crafted balance between private copyright protection and public use of works focuses on the exclusion of "short phrases" from copyright protection. A short phrase such as a part number typically lacks any creativity whatsoever. To provide copyright protection to a part number, therefore, would hinder "the Progress of Science and useful Arts" by denying the public ordinary access to a string of numbers. To the extent some legal protection of a short phrase is necessary to avoid public confusion of the source of a commercial product, protection is provided by the laws of trademark and unfair competition.

> The Copyright Office's "practice of denying registration to words and

phrases dates back at least to 1899." 1 W. Patry, Copyright 333 n. 89 (1994). In 1958, the Copyright Office issued Circular No. 46, titled Copyright In Commercial Prints and Labels. The circular explained that "[t]o be entitled to copyright protection, a work must contain something capable of being copyrighted — that is, an appreciable amount of original text or pictorial material." "Brand names, trade names, slogans, and other short phrases or expression cannot be copyrighted, even if they are distinctively arranged or printed." (A copy of Circular No. 46 is included in the addendum to this brief.)

Soon thereafter, the Copyright Office first published its short-phrases regulation. The regulation, issued under 17 U.S.C. § 702, currently provides:

§ 202.1 Material not subject to copyright.

The following are examples of works not subject to copyright and applications for registration of such works cannot be entertained:

(a) Words and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring; mere listing of ingredients or contents;

(b) Ideas, plans, methods, systems, or devices, as distinguished from the particular manner in which they are expressed or described in a writing;

(c) Blank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information;

(d) Works consisting entirely of information that is common property containing no original authorship, such as, for example: Standard calendars, height and weight charts, tape measures and rulers, schedules of sporting events, and lists or tables taken from public documents or other common sources.

(e) Typeface as typeface.

37 C.F.R. § 202.1 (emphasis added).

The regulation was immediately endorsed by the Second Circuit in *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir. 1959).

22

There, a copyright was sought on standard instructions on "how to serve" a cake. In rejecting that claim, the Second Circuit quoted the above regulation and described it as a "fair summary of the law." *Ibid. Accord, e.g., Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972) (applying *Sara Lee*, holding "most personal sort of deodorant" an "ordinary phrase" lacking "appreciable amount of original text" and therefore not protected by copyright); *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996) ("It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection.") (holding unprotectable "if you're still 'on the clock' at quitting time" and "clock in and make $50 an hour"); *Murray Hill Publ'ns, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 633 (6th Cir. 2001) (holding unprotectable "Good morning, Detroit. This is J.P. on JR in the A.M. Have a swell day.").

Relying on short phrases regulation, the Register of Copyrights routinely determines that a part number does not "constitute[] copyrightable subject matter." 17 U.S.C. § 410. For the Court's information, we attach two publicly available letters from the Examining Division of the Copyright Office that illustrate the Copyright Office's treatment of requests to register part numbers.(4) In the first letter, the Examining Division rejects a first appeal from a request to register the parts price list of Conway Technologies. The price list contains three columns: part numbers, a two or three word description, and a suggested price. In rejecting the request to register the "text" of the work, the Examining Division explained that short phrases are not protected because they lack a sufficient amount of creative expression. The Examining Division noted the availability of a "compilation" copyright registration, but explained that it would "not extend to the part numbers, part prices, and short descriptive phrases." See Letter of Nov. 16, 2001 from Virginia Giroux, Attorney Advisor, Examining Division, to Marsha Gentner (reproduced in the addendum to this brief). In the second letter, the Examiner initially rejects a request to register part number KP2062-3 for a drag cup. Letter of May 19, 2003 from Doris V. Berry, Examiner, Literary Section, to Mr. Floyd (reproduced in addendum).

The contrary rule — finding that a part number may "constitute[] copyrightable subject matter" — does not make sense. To accord copyright protection to part numbers would be to accord copyright protection to a particular sequence of numbers regardless of their use. Unlike trademark law, copyright law's protection is not limited to particular contexts. The owner of a copyright "has the exclusive rights" "to reproduce the copyrighted work." 17 U.S.C. § 106. If part numbers were protected, any reproduction of that number — in a computer program, in a math problem, in a lottery number — would potentially infringe the

copyright if the author had access to the copyright work. Although the fair use defense could (and, if necessary, should) be used to exonerate the use, parties should not be forced to prove an affirmative defense to copyright infringement for the mere use of numbers. See generally *Smithkline Beechum Consumer Healthcare, I.P. v. Watson Pharmaceuticals, Inc.*, 211 F.3d 21, 29 n.5 (2d Cir. 2000) (the "'danger lurking in copyright protection for labels is that the tail threatens to wag the dog — proprietors at times seize on copyright protection for the label in order to leverage their thin copyright protection over the text . . . on the label into a monopoly on the typically [unprotectable] product to which it is attached'") (citation omitted).

Moreover, we note that the Copyright Office will not register even a creative short phrase. Circular 34 (June 2002) (available at http://www.copyright.gov /pubs.html) provides further elaboration of the Copyright Office's practice regarding short phrases. In particular, the circular explains that "[e]ven if a name, title, or short phrase is novel or distinctive or if it lends itself to a play on words, it cannot be protected by copyright." In other words, even a creative short phrase is not protected by copyright. See also Compendium of Copyright Office Practices, Compendium II, § 305 ("short phrases or expressions are not copyrightable, even if such expressions are novel"). Just as ideas and facts are not protected by copyright in order that the public may use this information, so too all short phrases, even creative ones, are not protected so that the phrases are available for the public to use.

Instead of copyright law, short phases, at least when used in association with commercial products, are appropriately handled under trademark law. Circular 46 notes that "[u]nder certain circumstances, a name, slogan, phrase, symbol, or label may be entitled to protection under the general rules of law relating to unfair competition, or to registration under the federal trademark law." Likewise, Circular 34 explains that short phrases may be entitled to protection "under the general rules of law relating to unfair competition, or they may be entitled to protection and registration under the provisions of state or federal trademark laws." The circular notes that the "federal trademark statute covers trademarks and service marks — those words, phrases, symbols, or designs that identify the source of the goods or services of one party and distinguish them from those of others."

Congress's decision not to disturb the Copyright Office's long-standing practice against registering short phrases, despite repeated and extensive revisions of the copyright code, establishes that Congress approves of the complete bar on short phrases. When Congress was considering substantially revising the copyright laws before 1976, it recognized that short phrases would continue to be outside of copyright protection. See H.R. Rep. No. 90-83, at 14-15 n.1 (1967)

24

(describing "other areas of existing subject matter that this bill does not propose to protect but that future Congresses may want to" and including in the list of "areas of subject matter now on the fringes of literary property but not intended, solely as such, to come within the scope of the bill[:] ...titles, slogans, and similar short expressions"). Congress's acquiescence in the longstanding administrative rule against registering short phrases reflects Congress's approval of the rule. See *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 145 (2001) (noting that Congress was long aware of the Patent & Trademark Office's practice of issuing utility patents on plants which "suggests a recognition on the part of Congress" that the practice was authorized by statute).

To be sure, Nimmer on Copyright suggests that "even a short phrase may command copyright protection if it exhibits sufficient creativity." 1 Mellvile B. Nimmer & David Nimmer, Nimmer on Copyright, § 2.01[B] (2000). But, in view of the Copyright Office's long-standing practice and the availability of trademark protection, that is not how the Copyright Office interprets the copyright laws, an interpretation entitled to due weight. *See generally De Sylva v. Ballentine*, 351 U.S. 570 (1956) (deference to the Copyright Office's interpretation of ambiguous provisions in the copyright statutes is ordinarily warranted); Morris v. Business Concepts, Inc., 283 F.3d 502 (2d Cir. 2002) (granting panel rehearing, finding persuasive Copyright Office's view in Circular No. 62 — concerning registration of a serial — despite contrary statement in Nimmer on Copyright).

Brief Amicus Curiae of the United States in Support of Appellee Kanebridge Corp., *Southco Inc. v. Kanebridge Corp.*, No. 02-1243 (3d Cir. 2003) (filed May 22, 2003).

This Court does not agree with or adopt the entirety of the United States' argument, especially that portion relating to copyright protection extended to price lists and catalogues. *See infra* I(C), (D). It does, however, find the United States' position in regard to short phrases and numbers – protecting them under trademark rather than copyright law – a more logical way of treating part numbers than those previously discussed. Because the parties have not had the opportunity to brief this issue, however, this Court will not reach the question of whether the "short phrases or numbers" doctrine as outlined above may serve as an independent basis for judgment in the Defendants' favor.

## C. Compilation

Having concluded that Aftermarket's part numbers do not qualify for copyright

protection, this Court must still determine whether Aftermarket's catalogue is protected by

copyright law as a compilation.  Section 103 states:

> (a) The subject matter of copyright as specified by section 102 includes
> compilations and derivative works, but protection for a work employing
> preexisting material in which copyright subsists does not extend to any part of the
> work in which such material has been used unlawfully.

> (b) The copyright in a compilation or derivative work extends only to the material
> contributed by the author of such work, as distinguished from the preexisting
> material employed in the work, and does not imply any exclusive right in the
> preexisting material. The copyright in such work is independent of, and does not
> affect or enlarge the scope, duration, ownership, or subsistence of, any copyright
> protection in the preexisting material.

17 U.S.C. § 103.

In *Feist*, the Supreme Court noted that this statute gives rise to three elements that must

be met "for a work to qualify as a copyrightable compilation: (1) the collection and assembly of

pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those

materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement,

of an 'original' work of authorship." 499 U.S. at 357.

The Court discussed these three elements and concluded that "[t]he key to the statutory

definition is the second requirement.  It instructs courts that, in determining whether a fact-based

work is an original work of authorship, they should focus on the manner in which the collected

facts have been selected, coordinated, and arranged. . . . To that end, the statute dictates that the

principle focus should be on whether the selection, coordination, and arrangement are sufficiently

original to merit protection." 499 U.S. at 358.

The Court purposefully set the bar for originality low. "As discussed earlier, however, the originality requirement is not particularly stringent. A compiler may settle upon a selection or arrangement that others have used; novelty is not required. Originality requires only that the author make the selection or arrangement independently (i.e., without copying that selection or arrangement from another work), and that it display some minimal level of creativity." 499 U.S. at 358. The Court cautioned, though, "that the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist." 499 U.S. at 362.

Applying this low but extant standard to the white pages at issue in *Feist*, the Court concluded that the "selection, coordination, and arrangement of Rural's white pages do not satisfy the minimum constitutional standards for copyright protection." *Id.* The Court noted that the white pages in question "are entirely typical . . . [t]he end product is a garden-variety white pages directory, devoid of even the slightest trace of creativity." *Id.* Finally, the Court dismissed Rural's argument that its selection of listings constituted protected creative activity:

> Rural's selection of listings could not be more obvious: It publishes the most basic information – name, town, and telephone number – about each person who applies to it for telephone service. This is "selection" of a sort, but it lacks the modicum of creativity necessary to transform mere selection into copyrightable expression. Rural expended sufficient effort to make the white pages directory useful, but insufficient creativity to make it original.

340 U.S. at 362-63.

Like Rural Telephone Service Company, Aftermarket "expended sufficient effort to make [its catalogue] useful, but insufficient creativity to make it original." The overall design and

27

ordering of pages is very similar in most ways to McCarty's 1992 catalogue. *Compare* Dkt #124, Ex. 4[D] at 1-5 *with* Dkt #124, Ex. 4[E] at 4-27.  The only recognizable difference between the two catalogues is found on the pages listing the parts available.[16]  *Compare* Dkt #124, Ex. 4[D] at 35*ff* *with* Dkt #124, Ex. 4[E] at 378*ff.*   The differences between these sets of pages is negligible – both sort the transmission parts available by the part category, the part maker, and or the part number.  Organizing salable items by like kind, manufacturer or place of origin, and part number is no more creative than Rural's choice to organize persons by their zip codes, towns, or alphabetical orders.

Even without McCarty's 1992 catalogue as a model, however, Aftermarket's catalogue would not receive copyright protection.  Like the alphabetical telephone directory, it "is an age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course. It is not only unoriginal, it is practically inevitable." 499 U.S. at 363 (citation omitted); *see also* 499 U.S. at 348 (noting that choices for compilations must be both independent and original); *see also J. Thomas Distributors, Inc. v. Greenline Distributors, Inc.,* 100 F.3d 956, 41 U.S.P.Q.2d 1382, 1996 WL 636138 at *1-*2 (6th Cir. Oct. 31, 1996) (holding that the addition of subheadings and the reformatting of information "although perhaps original, lacks the requisite creativity for copyright protection" and describing such arrangements as "typical, if not inevitable . . . [that do] not qualify for copyright protection") (citations omitted).

It cannot be denied that WITT – and perhaps others – have benefitted from the work done by Aftermarket in creating and maintaining its catalogue.  Aftermarket cannot claim copyright

---

[16]The one further exception in similarity is in the illustrations, which will be analyzed independently in Section I(D), *infra*.

28

protection based on that work alone, however. *Feist*, 499 U.S. at 359-60 ("the 1976 revisions to the Copyright Act leave no doubt that originality, not 'sweat of the brow,' is the touchstone of copyright protection"); *id.* at 360 ("'A copyright in a directory . . . is properly viewed as resting on the originality of the selection and arrangement of the factual material, rather than on the industriousness of the efforts to develop the information.'") (citing *Miller v. Universal City Studios, Inc.*, 650 F.2d at 1369). That others may benefit from Aftermarket's work is, if anything, consistent with the basic object of copyright law. 499 U.S. at 349 ("[i]t may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation. As Justice Brennan has correctly observed, however, this is not 'some unforeseen byproduct of a statutory scheme.' It is, rather, 'the essence of copyright,' and a constitutional requirement.") (citations omitted).

### D. Illustrations

The parties dispute whether or not the illustrations contained in Aftermarket's catalogue are sufficiently original, i.e., creative, to merit copyright protection. Aftermarket concedes that its illustrator "relied on images of parts originating outside of ATC DG in helping him create the layout for the ATCDG's illustrations." (Dkt # 142 at 10.) Aftermarket's creative input came in the arrangement of those images: "He would get the best pictures available to him for a particular transmission, and then have them cut so that each part depicted in the image was an individual piece. Dalyn would arrange the individual images, representing the individual parts, and paste them on a board in the order that they would be torn down from the particular transmission being illustrated." (Dkt #142 at 10-11.) In other words, Aftermarket seeks copyright protection for the unique collage of parts its employee generated. The Defendants argue that no copyright

29

protection attaches to the drawings of the transmission parts "because [the] objective was to duplicate their appearance as precisely as possible without any creative or artistic flair." (Dkt #118 at 21.) They also argue that the images Aftermarket used are properly the copyright of another distributor.

Aftermarket's illustrations are an example of compilations-within-compilations and suffer the same defects as those discussed above. The origin and ownership of the individual images is not relevant in this analysis: Aftermarket must show some "modicum of creativity," and some independence, in the "selection or arrangement" of the images. This it has not done. The idea of displaying technical drawings in the order of assembly or disassembly may be original to the transmission parts industry but is otherwise unremarkable. If anything, it moves the illustrations farther into the category of works unprotected by copyright because they represent nothing but a compilation of facts in a realistic manner. *See Sparaco v. Lawler, Matusky, Skelly, Eng. LLP*, 303 F.3d 460 (2d Cir. 2002) (holding that a site map that depicted the site as it was is unprotected by copyright). As the Second Circuit explained:

> To the extent that the site plan sets forth the existing physical characteristics of the site, including its shape and dimensions, the grade contours, and the location of existing elements, it sets forth facts; copyright does not bar the copying of such facts. *See* [*Feist*] at 350-51 ("Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted. A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement."); *see generally* Pierre N. Leval, *An Assembly of Idiots?*, 34 Conn. L. Rev. 1049, 1056-58 (2002).

*Id.* at 467. Here, the illustrations cobbled together for Aftermarket's catalogue represent an uncreative and unoriginal reuse of other persons' work to better demonstrate the actual transmission parts. Copyright laws do not protect these sorts of illustrations.

30

## II.
### COUNT TWO: TRADEMARK INFRINGEMENT;
### COUNT FOUR: COMMON LAW TRADEMARK INFRINGEMENT

Count Two of the Third Amended Complaint alleges that WITT violated 15 U.S.C. §

1125(a) by "marketing and selling its products and services using parts numbers confusing

similar to ATC DG's trademarks." (Dkt #191 at 20.)  The Lanham Act protects unregistered

trademarks as well as registered ones; this Court's decision about the validity of the former must

be made in reference to the standards of the latter. *See Pesos* at 768 ("it is common ground that §

43(a) protects qualifying unregistered trademarks and that the general principles qualifying a

mark for registration . . . are for the most part applicable in determining whether an unregistered

mark is entitled to protection under § 43(a).").  Count Four alleges that WITT "intentionally and

wrongfully" used Aftermarket's part numbers to unlawfully "obtain the benefit of the goodwill

and well-established reputation of ATC DG and its products as symbolized by ATC DG's

trademarks."  (Dkt #191 at 23.) Because Count Four shares with Count Two a common

dispositive issue, this Court considers both simultaneously.

Key to these claims is whether Aftermarket can demonstrate a likelihood of confusion

regarding the goods and services offered by Aftermarket and WITT. *See Therma-Scan, Inc. v.*

*Thermoscan, Inc.*, 295 F.3d 623, 629-30 (6th Cir. 2002); *P.T.C. Brands, Inc. v. Conwood Co.*,

887 F. Supp. 963, 966-67 (W.D. Ky. 1995).  In analyzing the likelihood of confusion in a

particular scenario, courts look to eight factors as relevant and helpful:

> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services
> offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any
> evidence of actual confusion, (5) the marketing channels used by the parties, (6)
> the probable degree of purchaser care and sophistication, (7) the defendant's
> intent in selecting its mark, and (8) the likelihood of either party expanding its

product line using the marks.

*Therma-Scan, Inc.*, 295 F.3d at 630.

**A.    The Strength of Aftermarket's Mark**

This first factor examines the distinctiveness of a mark and its recognition among the

public. *Id.* at 631. A mark's strength measures "its tendency to identify the goods sold under the

mark as emanating from a particular source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss &

Co.*, 799 F.2d 867, 873 (2d Cir. 1986) (quoting *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d

1126, 1131 (2d Cir. 1979)). This strength depends upon the mark's distinctiveness, which varies

depending upon the particular category under which the mark falls: generic, descriptive,

suggestive, arbitrary, fanciful or coined. *Therma-Scan, Inc.*, 295 F.3d at 631. In this "spectrum

of increasing strength," *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109

F.3d 275, 280 (6th Cir. 1997), generic terms are entitled to no protection, while fanciful or

coined words are generally given the greatest levels of protection.

A generic term, which can never function as a trademark, is one that is commonly used to

describe a type of product rather than a producer. *Nartron Corp. v. STMicroelectronics, Inc.*, 305

F.3d 397, 404 (6th Cir. 2002). A descriptive term, which can only be protected if it has acquired

secondary meaning, identifies a characteristic of a product and not merely the product itself. *Id.*

at 404 & n.7.[17] A suggestive term suggests the product without identifying it, *see Induct-O-Matic*

---

[17]The practical difference between a generic and descriptive term is well-illustrated by
Judge Friendly's "Deep Bowl Spoon" example:

> "Deep Bowl" identifies a significant characteristic of the article. It is "merely
> descriptive" of the goods, because it informs one that they are deep in the bowl
> portion. . . . It is not, however, "the common descriptive name" of the article
> (since) the implement is not a deep bowl, it is a spoon . . . . "Spoon" is not merely

*Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362-63 (6th Cir. 1984) (quoting *Miller Brewing Co.*

*v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977)), for example, "Tide" laundry

detergent, *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-11 (2d Cir. 1976).

"An arbitrary mark has a significance recognized in everyday life, but the thing it normally

signifies is unrelated to the product or service to which the mark is attached, such as CAMEL

cigarettes or APPLE computers." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family*

*Music Ctr.*, 109 F.3d 275, 280-81 (6th Cir. 1997). Finally, a fanciful or coined word is one

invented for the sole purpose of being a trademark. *Rock & Roll Hall of Fame & Museum, Inc. v.*

*Gentile Productions*, 134 F.3d 749, 754 (6th Cir. 1998) (citing 1 J. McCarthy, *McCarthy on*

*Trademarks and Unfair Competition* § 11:5 (4th ed. 1997) ("McCarthy")).

"Context is important in distinguishing among categories: whereas as an air conditioning

company placing a penguin on its products has selected a suggestive mark, a publishing company

with the same logo has an arbitrary mark." *Abercrombie & Fitch Stores, Inc. v. American Eagle*

*Outfitters, Inc.*, 280 F.3d 619, 636 (6th Cir. 2002).

Here, the contested terms are the thousands of part numbers associated with the various

goods offered by Aftermarket and WITT. These numbers are descriptive; that is, for someone

familiar with Aftermarket's numbering system, the part numbers identify the parts in question.

As a leading treatise explains:

---

descriptive of the article[,] it identifies the article (and therefore) the term is
generic.

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, n.11 (2d Cir. 1976) (quoting
Fletcher, *Actual Confusion as to Incontestability of Descriptive Marks*, 64 Trademark Rep. 252,
260 (1974)).

A "style or grade designation" is, by definition, a designation that is used by a manufacturer or seller to differentiate one product in its line of goods from the others. Such designation may be viewed as "descriptive" in that it describes to the prospective buyer the kind or type of product this is. By definition, a "style or grade designation" serves primarily to describe the classification, size, type or quality of the product, rather than to distinguish this seller's goods from the goods of others. For this reason, the law classifies such "style or grade designations" as "descriptive," thereby requiring proof of secondary meaning to achieve the the a status of a trademark or service mark.

McCarthy, § 11:37 at 11-74; *see also Lawrence Mfg. Co. v. Tennessee Mfg. Co.*, 138 U.S. 537 (1891).

Descriptive words merit no protection absent a secondary meaning. A mark acquires secondary meaning "when 'in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself.'" *American Eagle Outfitters*, 280 F.3d at 635 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982) (alteration in original)). Relevant to whether secondary meaning exists are eight factors: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 311-12 (6th Cir. 2001).

Applying these factors to the present circumstance, Plaintiff has not demonstrated more than a scintilla of evidence that the mark has developed secondary meaning. Aftermarket has demonstrated proof of intentional copying, but it cannot show that its part numbers have established places in the market, given that the system that produced them was inspired, at least in part, by those of other competitors. In addition, the lack of consumer confusion (Aftermarket has brought forth evidence of only two such instances) demonstrates the absence of secondary

34

meanings.

**B.      Relatedness of the Goods or Services**

The relatedness of the parties' goods or services is relevant in the following manner: (1) where the parties' goods or services directly compete with one another, confusion is likely if the marks are sufficiently similar; (2) where the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; (3) where the goods or services are totally unrelated, confusion is unlikely. *Therma-Scan, Inc.*, 295 F.3d at 632. "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.'" *Id.* (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991)).

Here the goods and services offered by the parties are identical. Again, however, Aftermarket has not demonstrated that this fact will likely result in consumers believing that they come from the same company.[18]

**C.      Similarity of the Marks**

In analyzing the third factor, courts do not merely engage in a side-by-side comparison of the two marks in question. Rather, "the relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies." *Id.* at 633.

---

[18]Aftermarket alleges at various times that WITT intended to step into its shoes and convince its customers that it was, in fact, ATC DG. This allegation is, to say the least, in tension with Aftermarket's claim that the Defendants committed defamation *per se*. It is also not supported by Aftermarket's false advertising claim, which references an obsolete trade name, i.e., HTP.

Here, because the marks in question are in fact identical, this factor weighs in ATC DG's favor.

**D.     Actual Confusion**

Aftermarket has not demonstrated that there were more than two instances of consumer confusion between its products and WITT's. Because "the evidence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists," *id.* at 634 (quoting *Homeowners Group*, 931 F.2d at 1110), this factor weighs in WITT's favor.[19]

**E.     Marketing Channels Used**

This factor "requires an analysis of the parties' predominant customers and their marketing approaches." *Id.* at 636 (citing *Homeowners Group*, 931 F.2d at 1110). "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases." *Id.* (citing *Homeowners Group*, 931 F.2d at 1110)). Here, it can be assumed that the parties use similar (if not identical) marketing channels.

**F.     Purchaser Care and Sophistication**

In applying this factor, a greater sophistication in the relevant buyer pool diminishes the likelihood of confusion. Where the buyers in question have particular expertise in an area or are making expensive or unusual purchases, it is presumed that they will exercise a higher degree of care in differentiating between products and companies with similar trademarks. *Id.* at 637. This presumption would seem to apply in the present case, as the market for transmission products is specialized and presumably occupied by buyers familiar with the companies and the products

---

[19]Aftermarket may not, at the summary judgment stage, plead for more time or ask that this Court reserve judgment until trial. Even as a non-moving party, Aftermarket bears the duty of presenting more than a "scintilla" of evidence to support its claims.

involved.  While the similarity of the two respective marks decreases the likely degree of purchaser care, *see id.* at 638, this decrease is insufficient to tilt this factor in favor of Aftermarket.

**G.      Defendants' Intent in Selecting Its Trademark**

This factor examines the junior user's good faith in selecting its mark – a junior user's intent to create confusion may be sufficient in some cases to justify an inference of confusing similarity.  *Id.*  Intent can be inferred from circumstantial evidence of copying.  *Id.* at 638-39.  More than any other, this factor weighs heavily in favor of Aftermarket, given that there is more than circumstantial evidence of WITT's use of ATC DG's marks.

**H.      Likelihood of Expansion of the Parties' Product Lines**

No evidence exists that either party intends to expand its services beyond the field in which it now operates.  Nonetheless, "although evidence that either party will likely expand its product lines supports finding a likelihood of confusion, a finding that the parties will not expand their marks significantly does not address the ultimate issue of likelihood of confusion."  *Id.* at 639 (quotation marks, alterations, and citation omitted).  Accordingly, this factor neither supports nor counsels against Plaintiff's assertion of a likelihood of confusion.

**I.      Conclusion**

Although many of the factors listed favor finding a likelihood of confusion between Aftermarket and WITT, ultimately this Court is persuaded that the absence of actual confusion, the intended consumers' sophistication, and especially the absence of any sort of secondary meaning for Aftermarket's marks means that as a matter of law Aftermarket has no valid

trademark in its part numbers.[20]

### III.
### COUNT THREE: UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(A);

Aftermarket alleges in Count 3 of the Third Amended Complaint that the WITT and

Hester committed "unfair competition in the marketplace." (Dkt #191 at 25.) The Platiniff's

request for relief on this count reveals its scopes: "ATC DG is entitled [to an injunction

prohibiting WITT] from using ATC DG's Part Numbers and other proprietary materials and from

publishing false and misleading advertisements and other promotional materials." (Dkt #191 at

22.) Because this Court has already concluded that Aftermarket's part numbers and catalogues

are not entitled protection under copyright and trademark law, all that remains is the question of

whether WITT has impermissibly engaged in false advertising.

"Section 43(a) of the Lanham Act proscribes false designations of origin or false or

misleading descriptions of fact in connection with any goods in commerce that are likely to cause

confusion or that misrepresent the nature, characteristics, qualities, or geographic origin of the

goods." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). "The Lanham Act

does not prohibit false statements generally. It prohibits only false or misleading descriptions or

false or misleading representations of fact made about one's own or another's goods or services."

*Id.* at 1052. The Second Circuit explained the requirements under § 43(a) as:

> [T]he plaintiff must demonstrate that the statement in the challenged
> advertisement is false. Falsity may be established by proving that (1) the

---

[20] *See also* McCarthy, § 15:45 at 15-68:

> It is apparent that "it is only necessary to show that a *substantial segment* of the
> relevant group of consumers made the requisite association" between the symbol
> and the source to provide secondary meaning.

advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers.

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir.1997) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995)). Also, "in addition to proving falsity, the plaintiff must also show that the defendants misrepresented an 'inherent quality or characteristic' of the product. This requirement is essentially one of materiality, a term explicitly used in other circuits." *Id.* (citation and internal quotation marks omitted).

Here the advertisement in question is literally false – it asserts that WITT is "formerly HTP." (Dkt #127, Ex. CC.)  Of course, this is false – Aftermarket, not WITT, is the corporate successor-in-interest to HTP, and retains all the rights and privileges thereof.

"Where statements are literally false, a violation may be established without evidence that the statements actually misled consumers. Actual deception is presumed. *American Council of Certified Podiatric Physicians and Surgeons* v. *American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) (citations and quotations omitted).  Therefore, summary judgment in favor of Aftermarket is appropriate on this issue as to the issue of liability.  This Court reserves, for the time being, the question of remedy or damages.

**IV.**
**COUNT FIVE: COMMON LAW UNFAIR COMPETITION**
**COUNT SIX: AIDING AND ABETTING INFRINGEMENT AND UNFAIR COMPETITION**

Count Five alleges that the "acts of WITT . . . constitute unfair competition and unfair business practices by affording WITT an unfair competitive advantage in the market place." (Dkt #191 at 24.)  Aftermarket complains in particular of WITT's use of ATC DG's trademarks, WITT's "scheme to unlawfully pirate away ATC DG's employees and customers," WITT's use

of "confidential and proprietary business information," and WITT's "spreading false rumors about the demise of ATC DG's operations and the inability to service customers." (Dkt #191 at 24). Count Six of the Third Amended Complaint essentially adds Defendant Hester as a co-conspirator to Count Five as well as the earlier counts alleging infringement. (Dkt #191 at 25.)

The Kentucky Supreme Court has stated the requirements for common law unfair competition claims as "either (1) injuring the plaintiff by taking his business or impairing his good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his good will. Underlying the whole theory is the matter of actual or intended deception of the public for business reasons." *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 139 (Ky. 1969). The Kentucky Supreme Court also noted that courts should not grant relief "in the absence of a substantial showing that the defendant's conduct either (1) injured the plaintiff (by reason or the loss of business or impairment of good will) or (2) unjustly enriched the defendant (by reason of the exploitation of the plaintiff's good will)." *Id.*

In *Covington*, the Kentucky Supreme Court reversed an injunction granted to forestall a motor inn and cocktail lounge from using a name substantially similar to a nearby cocktail lounge at restaurant. The latter, the original business and plaintiff in the underlying case, operated as "White Horse Tavern," while the former, the defendant in the underlying case and the new owner of the structure involved, operated as "White House Motor Inn." After the two businesses with similar names began actively operating, confusion resulted. The cocktail lounge (White Horse) received mail and deliveries meant for the hotel (White House), as well as questions from guests seeking their rooms. There was also apparently the "misdelivery of 100-pound drum of hand soap." 445 S.W.2d at 137.

40

The Kentucky Supreme Court reversed the injunction on the grounds that "the record does not support a finding, and the Chancellor did not find, that the defendant [White House] intended any deception. As in the Gay case discussed above, the White House name had been used in good faith in other states." *Id.* at 139. The Kentucky Supreme Court also concluded that "there was no evidence that defendant was causing a loss of business to plaintiff nor was there evidence that defendant was exploiting or impairing the good will of the plaintiff." *Id.*

In this case Aftermarket has not presented claims sufficient to survive a motion for summary judgment. As noted above, claims of unfair competition are based on WITT's "taking [ATC DG's] business or impairing [its] goodwill" or on WITT's "unfairly profiting by the use of the plaintiff's name." Aftermarket's claims satisfy neither standard. In regard to the latter, this Court has determined that WITT did not infringe on the Defendant's trademarks; Aftermarket points to only one instance – the false claim of "formerly HTP" – which involves WITT illegally associating itself with Aftermarket's identity. (And even then, as noted previously, the identity in question is not Aftermarket's current trade name.) Moreover, Aftermarket's accusations are fundamentally inconsistent with its claims of trade defamation.

As to the former claim: it is undoubtedly true that WITT's existence has caused Aftermarket to lose profits. However, not all competition is unfair competition. *See* Restatement (Third) Unfair Competition § 1, comment a. Here, Aftermarket has successfully presented a claim for one instance (or at least one example) of false advertising, *see supra* Section IV, and possible claims of breach of contract and fiduciary duty on the part of Defendant Hester, *see infra* Section VI(A), (B). These claims, even if all proved, are not enough to support the independent contention that WITT or Hester engaged in unfair, illegal competition. Therefore, summary

41

judgment on these counts in the Defendants' favor is appropriate.

## V. CHOICE OF LAW

The parties dispute whether the law of Kentucky or the law of North Carolina applies to the questions at issue for the North Carolina Defendants. These questions include those of tort – unfair competition, breach of fiduciary duty, &tc. – and of contract. Because this case is brought under this Court's diversity jurisdiction, "the choice-of-law rules of the forum state, Kentucky, govern the determination whether to enforce" the contracts' selection of Kentucky law. *Wallace Hardware Company, Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000)(citing *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941); *Banek, Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993)).

### A. Tort Claims

Kentucky relies only on a "significant contacts" test to apply its own law to actions in tort. *See McGinnis v. Taitano*, 3 F. Supp.2d 767 (W.D. Ky. 1998). Here, Aftermarket and the North Carolina Defendants' employer are both Kentucky corporations and the consequences of the alleged tortious conduct were felt most strongly in Kentucky. *See Monumental Life Insur. Co. Nationwide Retirement Solutions, Inc.*, 242 F. Supp.2d 438, 450 n.8 (W.D. Ky. 2003) ("As this Court noted [earlier,] some of the wrongs alleged and the consequences of them occurred in Kentucky. Furthermore, [Aftermarket] claims that its losses were suffered in the state of Kentucky. The Court, therefore, applies Kentucky law to analyze the tort at issue."). This is sufficient to apply Kentucky law to the tort claims against the North Carolina Defendants.

### B. Contract Claims

As the Kentucky Court of Appeals recently stated, "it has been held in contract actions

that the law of the state with the greatest interest in the outcome of the litigation should be applied." *Bonnlander v. Leader National Insur. Co.*, 949 S.W.2d 618, 620 (Ky. App. 1996) (citing *Breeding v. Massachusetts Indemnity and Life Insurance Co.*, 633 S.W.2d 717 (Ky. 1982)). Some preference must also be given to the choice-of-forum clauses found in Defendant Bowman's employment contract. (*See* Dkt #191 Ex. A at 3 ¶ 13.)

Justice Cooper of the Kentucky Supreme Court recently, in dissent, dealt with a similar situation of an employment contract featuring a choice-of-law provision in a state other than that where the employee lived and worked. This Court finds his reasoning persuasive:

> Here, [Bowman] sought employment with a corporation knowing that its corporate headquarters were in [Kentucky.]. He freely signed an employment contract knowing that it required any contractual disputes to be resolved in [Kentucky.] As the United States Supreme Court observed in [*Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991),] the forum- selection clause also likely allowed [Bowman] to secure better terms, "reflecting the savings that [the ATC DG] enjoys by limiting the fora in which it may be sued." *Id.* at 594. [Bowman] negotiated other terms of the contract, and chose to leave this term intact."

*Wilder v. Absorption Corp.*, — S.W.3d —, 2003 WL 21355203 at *8 (Ky. 2003) (Cooper, J., dissenting). There is a strong preference in federal as well as state law to give effect to choice-of-forum clauses, *see Shute*, *supra*, and here North Carolina's interests do not outweigh that preference or the contacts between Defendant Bowman and Kentucky. Therefore, application of Kentucky law to the breach of contract claim leveled against him is appropriate.

## VI.
### COUNT SEVEN: BREACH OF CONTRACT BY HESTER AND BOWMAN
### COUNT TEN: BREACH OF FIDUCIARY DUTY

Count Seven alleges that Hester and Bowman "have violated the express terms and conditions of their written agreements with ATC DG which they agreed to abide by." (Dkt #191

at 26).   Count Ten alleges that Defendant Hester and the North Carolina Defendants have breached "their fiduciary duties and confidential relationship with ATC DG." (Dkt #191 at 28.) Additionally, Aftermarket's allege that "WITT is responsible for and liable for the individual Defendants' violations of duty" because they "were acting as employees or agents of WITT," among other reasons. (Dkt #191 at 28.)

## A.  Breach of Contract

Charles Bowman signed a contract in 1991 with HTP, the Platiniff's predecessor in interest, for the position of Vice-President and Sales Manager.  This contract provided that Bowman be assigned "management responsibilities of certain sales representatives of the Company and individual sales representatives for the company" and that he would not, "for a period of one (1) year following the termination of employment with employer, engage in any business or perform any service, directly or indirectly, which is directly competitive with any material component of the business." (Dkt #191, Ex. A at ¶¶ 3, 7.)

Bowman argues that this contract was voided effectively in 1992 when he stopped acting as sales manager and vice president and returned to the sales force.  His argument is bolstered by his contract's absence from the 1994 sales agreement listing the existing liabilities of HTP. Aftermarket responds with two arguments: first, that any evidence of intent of the parties to the contract must be discarded in favor of its terms, which indicate that HTP could provide for a diminution in duties within its bounds; and second, that the failure to list the contract in the Stock Purchase Agreement cannot be considered to show the existence (or non-existence) of the contract because Bowman cannot benefit from the ill-deeds of Hester.

Bowman's employment contract no longer binds him to Aftermarket.  As the Eighth

44

Circuit noted in a similar case, the employment contract "was not a contract entered into to govern [HTP's] employment relationship with [Bowman] into the indefinite future regardless of his position within the company." *Western Forms, Inc. v. Pickell*, 308 F.3d 930, 933 (8th Cir. 2002). Moreover, the absence of Bowman's contract from the Stock Purchase Agreement undercuts any claim Aftermarket might have to its benefits and provides further evidence, albeit parol, of the true scope of the contract.[21]  Therefore, summary judgment in Defendant Bowman's favor on Count Seven is appropriate.

Hester's agreement not to compete, on the other hand, was clearly in force until August of 1999. (See Dkt #191, Ex. C.)  The only question is whether the actions he took prior to that month were sufficient to breach that agreement. By Aftermarket's own allegations, Hester "identified prospective standard transmission parts distributors to purchase; he established a location for his business; and he, consulted with his attorney and accountant."  A jury could reasonably find that these steps violated his noncompetition agreement. Therefore, summary judgment on Count Seven in regard to Defendant Hester is inappropriate.

## B. Breach of Fiduciary Duty

The Kentucky Supreme Court has noted that

---

[21]Parol evidence is admissible here to show the intended duration of the agreement between the parties. "As is written in *Putnam v. Producers' Live Stock Marketing Ass'n.*, 256 Ky. 196, 75 S.W.2d 1075, 100 Al. L.R. 828, the duration of the employment is dependent upon the understanding and intent of the parties, which is determined from their written or oral negotiations, and the circumstances surrounding the transaction, including the situation and object of the parties. Here the writings relied upon to establish the contract were incomplete upon their face and parol evidence was properly admitted by the trial court to aid in establishing the intention of the parties, *Bullock v. Young*, 252 Ky. 620, 67 S.W.2d 941, 946; but the petition stated a cause of action, and the exhibits sued on take the case out of the statute of frauds." *Hamilton Carhartt Overall Co. v. Short*, 197 S.W.2d 792, 793 (Ky. 1946).

> it is extremely difficult, if not impossible, to formulate a comprehensive definition of [fiduciary duty] that would fully and adequately embrace all cases. Nevertheless, as a general rule, we can conclude that such a relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking.

*Steelvest, Inc. v. Scansteel Service Center*, 807 S.W.2d 476, 485 (Ky. 1991).

Before continuing, it is worth noting which of the defendants here would be subject to this definition – in other words, who of the defendants owed Aftermarket a fiduciary duty? Hester, as an officer of Aftermarket, did. *See* 807 S.W.2d at 483 ("Kentucky law has, however, recognized that directors and officers of a corporation may not set up, or attempt to set up, an enterprise which is competitive with the business in which the corporation is engaged while still serving as directors and officers."). Hester argues that his removal from day-to-day operational control and the forewarning he gave ATC DG's management ended his fiduciary duty, but this argument relies on a strained reading of *Steelvest*. It is true in that case that Scanlan's breach of his fiduciary duty occurred without any notice to his employer comparable to that Hester gave in this case. *See* 807 S.W.2d at 484. It does not follow, however, that such notice would have cured his breach, especially in light other Kentucky cases. *See DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir. 1985) ( "the duty of loyalty and faithfulness includes the obligation not to act against the employer's interests [and] not to establish a competing enterprise until after the employment relationship is terminated.") (citations omitted). A jury, reviewing the facts presented thus far, could conclude reasonably that Hester had violated his fiduciary duty to Aftermarket. Therefore, summary judgment for Hester on Count Ten is inappropriate.

The rest of the individually-named defendants, the North Carolina Defendants, did not

owe a fiduciary duty to Aftermarket.  The ordinary employer-employee relationship that existed

between the North Carolina Defendants as salespeople and Aftermarket does not give rise to

fiduciary duties under Kentucky law.  *See Steelvest*, 807 S.W.2d at 483 (finding that the

defendant was not "a mere employee" and "therefore [he] owed a duty of loyalty and faithfulness

to the corporation"); *accord Aero Drapery of Kentucky, Inc. v. Engdahl*, 507 S.W. 2d 166 (Ky.

1974) (upholding judgment in favor of salespeople in a breach of fiduciary duty claim); *see also*

*Stewart v. Kentucky Paving Co., Inc.*, 557 S.W.2d 435 (Ky. 1977) (finding a fiduciary

relationship between salesperson and employer only under an unusual factual situation).

Therefore, summary judgment on Count Ten in favor of the North Carolina Defendants is

appropriate.

  This Court reserves for the time being the question of whether or not WITT may be held

liable for aiding-and-abetting Hester's alleged actions.[22]

## VII.
### COUNT EIGHT: UNJUST ENRICHM ENT AND QUANTUM MERUIT
### COUNT NINE: MISAPPROPRIATION AND CONVERSION

  Aftermarket alleges in Count Eight  that the "Defendants have unjustly enriched to the

---

[22]  *Steelvest* notes that "[o]ne who knowingly aids, abets, or joins a fiduciary in the breach of his duty in order to make a profit becomes jointly liable with the fiduciary for such profits."  807 S.W.2d at 486.  The Kentucky Supreme Court, in *Steelvest*, specifically extended this potential liability to the corporations which were "in a sense, their alter egos and are the instrumentalities through which these parties profited, all to the detriment of the [Plaintiff.]" *Id.* at 487.  Fiduciaries duties, however, are creatures of equity, *see Steelvest*, 807 S.W.2d at 485, which do not extend beyond the termination of the relationship between the parties, except perhaps as they relate to actions taken during the course of that relationship.  Because WITT did not exist until after Hester's employment ended, it cannot normally be responsible for aiding and abetting any of his actions breaching his fiduciary duty.  *Cf. Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983) (noting that piercing the corporate veil is "an extraordinary procedure").  WITT is the beneficiary, however, of Hester's alleged bad acts.  Therefore, whether the corporate veil should be pierced in one form or another here remains an open question.

detriment of ATC DG, for which ATC DG is entitled to relief, including restitution.  Defendants are in possession of property of ATC DG, or are otherwise using the property of ATC DG." (Dkt #191 at 26.)  Count Nine alleges that "[t]he use by Defendants of ATC DG's Part Numbers, the Taxonomy, the Catalogs and ATC DG's confidential and proprietary business information to serve their own selfish interests, constitutes an unlawful misappropriation and conversion of ATC DG's valuable property rights and is inconsistent [with them.]" (Dkt #191 at 27.)  These two counts encompass Aftermarket's complaints about the Defendants' use of its "parts numbering system, its parts numbers, and its trade secrets," as well as its catalog illustrations. (Dkt #142 at 27.)[23]

## A.  Part Numbers, Part Numbering System, and Catalogue Illustrations

Aftermarket's claims – so far as they encompass complaints about its part numbers, part numbering system, or catalogue illustrations – are preempted by federal copyright law.[24] Copyright preemption is governed by two questions.  "In sum, under § 301, a state common law or statutory claim is preempted if: (1) the work is within the scope of the "subject matter of copyright," as specified in 17 U.S.C. §§ 102, 103; and, (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106."  *Wrench v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001).

_____

[23]There appears to be some contention that the Defendants took with them certain third-party materials. Aftermarket has not specifically described these materials, therefore this Court will assume they are *de minimis* and irrelevant.

[24]To the extent Aftermarket's part number system falls completely outside the ambit of copyright protection – either of "subject matter" or "type" – claims regarding it would be preempted by federal patent law.  *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989) ("the States may not offer patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law.").

Aftermarket argues that this Court's decision about federal copyright protection of these claims is determined by its earlier determination that they are not "subject matter" subject to copyright protection. (*See*, e.g., Dkt #142 at 27 ("ATC DG's claims for unjust enrichment/quantum meruit and misappropriation/conversion are preempted only if these works are protectable copyright.").) This argument is incorrect: there is nothing inconsistent with finding the numbers and illustrations unprotected by copyright while at the same time finding that any state law claims relating to them have been preempted.

The Second Circuit and the Seventh Circuit have both noted that it would be anomalous if the states could protect by tort law what Congress intended to leave unprotected. *See ProCD, Incorporated v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996) ("One function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if 'subject matter of copyright' includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection to them."); *see also National Basketball Assoc. v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997) ("The House Report stated: 'As long as a work fits within one of the general subject matter categories of the sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify.") (citing H.R. No. 94-1476 at 131, *reprinted in* 1976 U.S.C.C.A.N. at 5747). The contrary result, suggested by Aftermarket's brief, would leave intellectual property law subject to patchwork and *post hoc* regulation by the various states – such result is inconsistent with Congress's intent for § 301 preemption.

49

**B. Trade Secrets**

By alleging misappropriation, conversion, &tc. of its "trade secrets," Aftermarket means to recover for the Defendants' use of its customer lists, 30-60-90 day reports, and other related information. These claims are also preempted by the Kentucky Uniform Trade Secrets Act.

The Uniformed Trade Secrets Act, codified in Kentucky at K.R.S. § 365.892, provides that "K.R.S. 365.880 to 365.900 replaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Like the copyright protection discussed previously, this preemption extends even to those actions which this Court might dismiss on the grounds that the material misappropriated was not, in fact, a trade secret. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp.2d 784, 788-89 (W.D. Ky. 2001) ("KUTSA replaces other law relating to the misappropriation of trade secrets, regardless of whether the plaintiffs demonstrate that the information at issue qualifies as a trade secret.").

The Kentucky Uniform Trade Secrets Act defines trade secrets as "information, including a formula, pattern, compilation, program, data, device, method, technique or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." K.R.S. § 365.880(4). The Defendants contend that the information they took with them when they left Aftermarket's employ does not fall within this definition. That information included: customer lists, customer purchasing contacts, reports detailing accounts receivable, and information on pricing and credit extended to customers.

Kentucky courts have not fleshed-out the definition of trade secrets under K.R.S. §

365.880.   In addition, courts in other jurisdictions appear to be split on the issue of whether customer lists and pricing information receive protection as trade secrets.  It is worth noting, in the beginning , that this district court has previously noted with approval other courts' holding that "information compiled from various generally known and accessible sources does not qualify for protection" as trade secrets.  *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp.2d 784, 795 (W.D. Ky. 2001) (citing *Western Med. Consultants, Inc. v. Johnson*, 80 F.3d 1331, 1337 (9th Cir. 1996) (quotation omitted)).   Courts in many jurisdictions have relied upon factors set forth in the Restatement of Torts § 757: (1) the extent to which the information is known outside [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken . . . to guard the secrecy of the information; (40 the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *See, e.g., In re American Preferred Prescriptions v. Health Mgmt., Inc.*, 186 B.R. 350, 356 (Bankr. E.D.N.Y. 1995); *Colorado Supply Co., Inc. v. Stewart*, 797 P.2d 1303,1306 (Co. Ct. App. 1991); *Hayden's Sport Center, Inc. v. Johnson*, 441 N.E.2d 927, 943 (Ill. Ct. App. 1982).

1.  Customer Lists & Customer Purchasing Contacts

Kentucky courts have never addressed whether or not the Kentucky Uniform Trade Secrets Act protects customer lists or closely-related contact information.  Other states, including those that adopted the Uniform Trade Secrets Act, are split.  Some, like North Carolina and Colorado, do not traditionally protect customer service lists.  *See UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 447 (W.D.N.C. 2002) (citing *Novacare Orthotics & Prosthetics*

*East, Inc. v. Speelman*, 528 S.E.2d 918 (2000)); *Colorado Supply Co.*, 797 P.2d at 1306-07 (citing cases). States that have found customer lists protected include Pennsylvania and New York. *See Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 107 (3d Cir. 2001) (applying Pennsylvania law); *Universal Marine Medical Supply, Inc. v. Loveccchio*, 8 F. Supp.2d 214, 222 (E.D.N.Y. 1998) (acknowledging a somewhat dubious distinction between customer lists "readily ascertainable" from outside sources and those which the employee "had stolen or memorized").

This Court has discovered only one decision that applies a blanket rule protecting customer lists. *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp.2d 67, 76 (D.D.C. 2001) ("To the extent that this district has not had occasion to address the issue, this court now holds that the customer lists of a financial-services firm deserve trade-secret status."). All other decisions apply some sort of balancing test relying on factors found in the Restatement of Torts. *See, e.g., American Preferred Prescription*, 186 B.R. at 356 ("customer lists may qualify as trade secrets where the customers are discoverable only through **extraordinary efforts** and the employer's clientele has been secured through many years' expenditure of time and money.") (emphasis added).

There is no evidence that Aftermarket's acquired its customer lists – or knowledge of a particular customer's purchasing agent – through any sort of extraordinary effort. Aftermarket and WITT's target consumers are not the sort, like the HIV patients discussed in *American Preferred*, who would naturally seek confidentiality or otherwise refuse approaches from many different transmission parts salesmen. *See Colorado Supply Co.*, 797 P.2d at 1306-07 ("customer information was not a protectable trade secret, but rather general knowledge, where access to the

52

information was not restricted, employees knew customers' names from general experience, and customers commonly dealt with more than one supplier") (citing *Smith Oil Corp. v. Viking Chemical Co.*, 468 N.E.2d 797 (Ill. Ct. App. 1984)).

The conclusion that customer lists and purchasing agents are not protectable trade secrets is consistent with the factors set forth in the Restatement. This information is readily available to people outside the business, it can be acquired with relative ease, and the value derived from any secrecy or confidentiality is minimal. While Aftermarket made reasonable efforts to keep the customer lists and purchasing contact information confidential, *see, e.g.,* Dkt # 144, Ex. G, Index 2.05 ("Confidential Treatment of Information,"), it has failed to provide evidence that as a matter of law the customer lists and purchasing contact information derive "independent economic value . . . from not being generally known to and not being readily ascertainable" to WITT and other competitors. *See* K.R.S. § 365.880(4)(a).[25]

2. Financial Information: Accounts Receivable, Pricing and Credit Extended to Customers

The rest of the information Aftermarket seeks to protect falls more easily than the customer lists within the protection K.R.S. § 365.880 *et seq.* affords. In *Marina Management Services, Inc. v. Kentucky*, 906 S.W.2d 318 (Ky. 1995), the Kentucky Supreme Court held that the Open Records Act would not apply to requests for "confidential audited financial reports of a privately owned corporation" that the Commonwealth possessed. *Id.* at 318. The Kentucky Supreme Court concluded that

___

[25]Merely declaring some information a trade secret or confidential does not bring it within the ambit of K.R.S. § 365.880. Moreover, this Court does not attach much significance to Defendant Litchfield's admission that he would not share his Rolodex with his competitors. *See* Dkt #144, Ex. I at 41. The Kentucky Uniform Trade Secrets Act does not draw such a bright line between the confidential and the absurd.

> records submitted to the Parks Department include information on asset values, notes payable, rental amounts on houseboats, related party transactions, profit margins, net earnings, and capital income. These are records of privately owned marina operators, disclosure of which would unfairly advantage competing operators. The most obvious disadvantage may be the ability to ascertain the economic status of the entities without the hurdles systematically associated with acquisition of such information about privately owned organizations.

*Id.* at 319. This Court finds it likely that the Kentucky Supreme Court would extend similar protection to financial business information that Aftermarket had taken reasonable efforts to protect.

This Court recognizes that some courts have found that any information which a competitor could obtain through legal means, including from a third party who possessed that information, cannot be protected as a trade secret. As the Eighth Circuit explained:

> In a Missouri case analogous to this, the court held that the kind of information Western seeks to protect is simply not protectable:
>
>> [d]efendants have, of course, carried with them a considerable amount of helpful information respecting sales of industrial oils in the territories they covered. Through their knowledge of the market and personal contacts they may be able to capture substantially all of plaintiff's business. But the knowledge they will use for this purpose is nonetheless generally unprotectable. It is obvious that the identity of the customers with which the St. Louis office dealt is not a trade secret. The important ones were the companies in the area which had use for large quantities of industrial oils, known to anybody in the business. As to their individual requirements, such data is not common knowledge to the same extent. But it is still information obtainable without recourse to misappropriation from a former employer. There is no reason to doubt that most price information is similarly obtainable.

> *Metal Lubricants Co. v. Engineered Lubricants Co.*, 284 F.Supp. 483, 488 (E.D.Mo.1968), aff'd, 411 F.2d 426, 428 (8th Cir.1969) (noting that the Supreme Court of Missouri has set up strict standards of proof for misappropriation of trade secrets claims). "Although the above quotation is in specific reference to trade secrets, it is equally applicable to show that the information ... was not confidential

because that information was known or easily obtainable by others." *Walter E. Zemitzsch, Inc. v. Harrison*, 712 S.W.2d 418, 421 (Mo.Ct.App.1986).

*Western Forms, Inc. v. Pickell*, 308 F.3d 930, 934 (8th Cir. 2002); *see also Rogers v. Desa International, Inc.*, 183 F. Supp.2d 955 (E.D. Mich. 2002). In *Rogers*, the Eastern District of Michigan, applying K.R.S. § 365.880(4), concluded that the plaintiff's information was not protected as a trade secret because he had failed to take reasonable measures to keep it confidential. 183 F. Supp.2d at 958. That court also commented:

> Though Desa did not raise the issue in its briefs, it is possible that Rogers's trade secret claim would also fail because the information is readily ascertainable through proper means. Under this theory, if an alleged trade secret can be obtained through legitimate means, the information has no independent economic value and therefore is not a trade secret. . . . However, as this question was neither briefed nor argued, and is not necessary for the ultimate conclusion, I need not make such a finding.

183 F. Supp.2d at 958 n.1.

While the sort of bright-line rule adopted by Missouri courts and endorsed by *Rogers* has a great deal of appeal, especially in its ease of application, this Court finds that it is inconsistent with the Kentucky Supreme Court's broad policy that "commercial competition must be conducted according to simple and basic rules of honesty and fair dealing." *Steelvest*, 807 S.W.2d at 484. Also, contrary to the customer lists discussed previously, the financial and pricing information has more obvious economic value and is available publicly only through much greater and more sustained effort.

Ultimately, however, because the determination of what is or is not a trade secret depends so much on factual variables like those found in the Restatement, and because the record is not clear in establishing the records' economic value and or the difficulty of procuring them, this

Court will reserve judgement on the issue of the financial records for possible determination by the jury.

## C.  Inevitable Disclosure

As an alternative basis for finding the Defendants liable, Aftermarket argues that they would "inevitably disclose"its trade secrets.[26]  Plaintiff relies on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995).  In *Redmond*, the Seventh Circuit approved an injunction that prohibited the former general manager for Pepsi's California division from assuming duties at Quaker Oats (owner of Gatorade) which would ultimately bring him to supervise the commercial competition between his new and old employers.  The injunction specifically forbade Redmond from assuming any duties at Quaker Oats for a specified period of time and enjoined him "forever from disclosing [Pepsi's] trade secrets and confidential information."[27]  *Id.* at 1272.

The Seventh Circuit concluded that "Redmond cannot help but rely on PCNA trade secrets as he helps plot Gatorade and Snapple's new course." *Id.* at 1270.  The Seventh Circuit held that even the potential disclosure of information, absent any actual proof thereof, was sufficient for Pepsi to sustain its claim. *Id.* at 1270 ("Redmond **might** be faced with a decision that **could** be influenced . . .") (emphasis added).  The Seventh Circuit also relied on the district court's determinations of credibility and the lower court's finding that Redmond lacked "forthrightness." *Id.* at 1271.

Kentucky courts have long recognized and enforced, under certain circumstances, non-

---

[26]This allegation includes, by implication if not explicitly, the charge that Defendant Hester might improperly use information gathered while in Aftermarket's employ.

[27]The latter part of the injunction, of course, would be available under the trade secrets act analysis discussed above. *See supra* VII(A)(2).

compete agreements or restrictive employment covenants. *See, e.g., Thomas W. Briggs Co. v. Mason*, 289 S.W. 295 (Ky. 1926). Courts must carefully monitor the limitations of these agreements for inequity, however. *See Orion Broadcasting, Inc. v. Forsyth*, 477 F. Supp. 198, 200-01 (W.D. Ky. 1979) (noting that "The modern philosophy of the law is that a man may sell his services but not himself . . . .") (citing *Calhoun v. Everman*, 242 S.W.2d 100 (Ky. 1951). Kentucky courts base such restrictions either on contractual provisions, *see id.* or existing fiduciary duties. *See Stewart v. Kentucky Paving Co., Inc,.* 557 S.W.2d 435 (Ky. 1977).

This Court concludes that Kentucky courts would not recognize the doctrine of inevitable disclosure in a manner applicable to this case. First, this Court has concluded that the North Carolina Defendants owed no fiduciary duty to Aftermarket: they can hardly be held to a higher standard *after* the end of their employment than they were *during* it. Second, Aftermarket and Defendant Hester contracted for a non-compete clause, now expired. Applying the "inevitable disclosure" doctrine to this case would allow Aftermarket to receive benefits over and above its bargain, benefits for which it provided no consideration.

To the extent that the Defendants in this case would have damaged Aftermarket by disclosing its trade secrets, redress lies under KUTSA. As the Seventh Circuit acknowledged in *Redmond*, trade secret law should not act as a "reserve clause" for employers. 54 F.3d at 1268 (citing *Flood v. Kuhn*, 407 U.S. 258 (1972)). The Defendants here had extensive experience in the industry prior to their employment at ATC DG. To suggest that once they began employment with ATC DG their opportunity for further employment in the transmission parts industry ended in effect gives Aftermarket monopoly-like powers over the salesman or managerial employment market.

## VIII.
### COUNT ELEVEN: TRADE DEFAMATION

Aftermarket alleges that Defendants WITT, Hester, Litchfield, and Leech "defamed ATC

DG by falsely impugning its trade reputation." (Dkt #191 at 29.)[28]  Aftermarket complains in

particular about the following letters from Defendants Leech and Litchfield.

In March of 2000, Defendant Leech wrote:

> I am writing this letter to all of my customers past and present to thank you
> for all your support, loyalty, patience and trust you have given me over the last
> several years.  After 17 years with the company and four name changes on the top
> of our building I have had enough [!] There are a lot of great people who work for
> ATC but I am to the point that I can not service the customer, be competitive, nor
> can I fix accounting flaws.  Without that ability I can not take care of my customers
> the way they are supposed to be [!] The good news is I am going with a new
> company called "WIT."
>
> This company is headed by previous HTP owner Kenny Hester.  After
> seeing and hearing all of his customers and ex-employees complain and suffer over
> things that should have never happened, Kenny Hester decided to open up again to
> service the customer the way it is supposed to be [!]
>
> It will be 2-3 weeks before we can open our doors to do this job right.  I
> realize that is a long time and you will still need parts from somewhere.  Our
> Louisville, KY branch is open now and can service you until we get our doors
> open.  I realize this is two day UPS shipping but you will be serviced properly [!]
> Buy emergency items locally and the rest from WIT [!]
>
> I will be in contact with all of you soon.  This is not goodbye, this is going
> back to the way it used to be.  "The Customer Comes First, Quality Parts and the
> Best Service Possible."  Just so you know, the name "WIT" stands for Whatever It
> Takes[,] which I hope says it all on our sincere commitment to you the customer.
>
> The way it is supposed to be[.] Do not settle for anything less.

(Dkt #144, Ex. K.)[29]  Defendant Litchfield wrote:

---

[28]Because this Court disposes of the trade defamation claim on its merits as it relates to all
the North Carolina Defendants it will not reach the question of whether the defamation claims
are time-barred under Kentucky law, an issue neither party addressed.

[29]This Court has edited the letter to remove punctuation and unorthodox capitalization.  It
also notes that the letter was sent bearing "ATC" letterhead.

I would like to take this opportunity to thank you for your friendship and support these past years. We have experienced a great deal of situations over the years, some good, some not so good, but you continued to support me nonetheless, and for that I am grateful.

Effective immediately, I am no longer affiliated with ATC. Our business philosophies have grown too different for me to effectively serve you, my customer, as you are entitled to be served.

It is with great pleasure and excitement that I announce that I am joining the team of WIT Transmission Parts (Whatever It Takes). That's not just a name, its our mission statement. The WIT team is made up of former HTP employees with Kenny Hester as our owner. With a warehouse and sales office in Louisville, KY. already operational and a warehouse and sales office in Charlotte, N.C. soon to be opened, we can once again service all your transmission parts needs.

We intend on being operational in Charlotte by April 1, 2000. I will be in contact with you to let you know of our progress. By the time you get this letter, we will have already achieved many goals that we have set for ourselves.

In the event we aren't open for business, please feel free to call WIT in Louisville at [omitted] where there is over 100 years of combined experience to help you with your transmission parts needs. I look forward to speaking and working with you soon. Please feel free to call me at home at [number omitted] or email me at [omitted.]

(Dkt #144, Ex. N.)

This district has previously noted that defamation is "not a readily understood area of the law." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) (quoting *Columbia Sussex Corp., v. Hay*, 627 S.W.2d 270, 272 (Ky.Ct.App.1981)). "Defamation consists of the following elements: (1) defamatory language; (2) about the plaintiff; (3) which is published; (4) which caused injury to reputation. The defamatory statement must be false." *Id.* (citations omitted). Defamation claims are characterized as either *per se* or *per quod*.

As the district court in *CMI* explained, "[t]o constitute defamation *per se*, the words in their essence must tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society." 918 F. Supp. at 1083. When considering a writing under

*per se* analysis, "courts must stay within the "four corners" of the written communication. The

words must be given their ordinary, natural meaning as defined by an average lay person. The

face of the writing must be stripped of all innuendos and explanations." *Id.* (citations omitted).

The statements in these letters do not constitute defamation *per se*. As the district court

in *CMI* explained:

> The doctrine of defamation per se grew out of a need to provide
> individuals a remedy for statements which damaged their reputations by the very
> nature of the words where the individuals could not prove actual damages.
> ***
> Businesses do not have personalities that are hurt so intangibly. If a
> business is damaged, the damage is usually reflected in the loss of revenues or
> profits. Therefore, courts should be very cautious about labeling as defamation per
> se comments made about a corporation or its products.
> Few cases have addressed the issue of whether criticism or disparaging
> words about a company's products are actionable per se. It has been said that the
> words [must] contain an imputation of fraud, deceit, dishonesty or other
> reprehensible conduct on the part of the merchant. Sometime ago Judge Ballantine
> appeared to assume that unless the words contain an imputation of fraud, deceit,
> dishonesty or other reprehensible conduct they are not actionable per se. To
> merely say bad things about a product or to say, in so many words, that it will fail
> in its essential purpose, would seem not to constitute defamation per se..

*CMI*, 918 F. Supp. at 1084 (citations and quotations omitted). . The statements made in Leech

and Litchfield's letters do not rise to this level. They do not suggest that Aftermarket committed

fraud, or was deceitful, deceptive or dishonest. Nor do the letters suggest that the customers

addressed should hate or ridicule Aftermarket, or consider it somehow a disgrace. These letters –

suggesting, at most, that the salesmen and their customers had reason for dissatisfaction with

Aftermarket – do not rise even to the level of the statements discussed in *Belo Kentucky, Inc. v.*

*Kentucky Kingdom Amusement Co.*, 2000 WL 1336681 (Ky. App. Sept. 08, 2000). In that case,

the statements in question accused an amusement park of operating a ride that had

"malfunctioned," was "too dangerous," and had a key piece of safety equipment removed. *Id.* at *2-*3. These statements were made after an accident on the ride caused serious injuries – a lacerated liver – to a seven year-old girl. *Id.* at *1. However unpleasant Leech and Litchfield's public criticism of Aftermarket was, it did not suggest (by implication, if not directly) that it was responsible for operating machinery that caused serious physical harm to small children.

Aftermarket cannot recover for defamation *per quod* because it has not presented enough evidence of damages related directly to the letters in question. "In a per quod action, the words themselves may or may not be defamatory. Courts focus not upon the actual meaning of the words but on the extrinsic facts which explain the meaning of the communications. More important . . . damages to corporate reputation may be proven only by loss of profits **caused by the defamation.** The pecuniary loss must be a **direct and proximate result** of the defamation." *CMI*, 918 F. Supp. at 1083 (citations omitted, emphasis added).

The circumstances surrounding the letters' publication support – at least for summary judgment purposes – the argument that they are defamatory *per quod*. That is, in the context of the mass exodus of Aftermarket's Charlotte office, a jury could reasonably find that the statements in the letter constituted some sort of defamation. What Aftermarket has failed utterly to prove, however, is any sort of damages caused by the letters themselves. Aftermarket has presented no evidence, e.g., affidavits or testimony (or account evidence), from customers who received the letters about the letters' impact on their buying decisions. The expert report cited by Aftermarket appears to assume that all profits realized by WITT in the Charlotte market are attributable to these alleged defamatory statements. (Dkt #141, Ex. O at 4.) This report not only fails to separate and identify the damage caused by Aftermarket's other allegations, but it also

61

provides no proof that any customer changed his or her buying habits as a result of receiving the letters. Aftermarket must provide more than a "scintilla" of evidence on this element to survive summary judgment; it has provided none.

## IX.
### COUNT TWELVE: INTENTIONAL INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

In Count Twelve of the Third Amended Complaint, Aftermarket alleges that the "Defendants tortiously interfered with the business relationships between ATC DG and ATC DG's employees and customers [by] unlawful pirating of ATC DG's employees and customers." It also alleges that "WITT has further knowingly, intentionally and unjustifiably interfered with ATC DG's agreements with Hester and Bowman." (Dkt #191 at 30-31.) Aftermarket suggests that the bases for this claim are the Defendants' interference with fiduciary and contractual relationships, their defamation and their use of "confidential and proprietary trade information." (Dkt #143 at 34.)

The Kentucky Supreme Court has recognized the tort of intentional interference with contractual business relationships in scope congruent with Restatement (Second) of Torts § 766B, 767, and 777. *National Collegiate Athletic Ass'n v. Hornung*, 754 S.W. 2d 855, 857-58 (Ky. 1988) ("Upon examination of our decisions, we conclude that the foregoing sections of the Restatement fairly reflect the prevailing law of Kentucky."). To determine whether the interference was improper, the Kentucky Supreme Court relied on the seven factors outlined in § 767 of the Restatement (Second) of Torts. *Id.* at 858. Those factors are: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interest sought to be advanced by the actor; 5) the social interests in protecting

62

the freedom of action of the actor and the contractual interests of the other; 6) the proximity or

remoteness of the actor's conduct to the interference; and 7) the relations between the parties.

Aftermarket's case does not survive scrutiny under these factors. First, the Defendants'

actions were not without justification, albeit one Aftermarket would have little sympathy for. *See*

*Hornung*, 754 S.W.2d at 859.[30] Second, the North Carolina Defendants owed Aftermarket no

fiduciary duty; therefore, their interests in employment (and the public policy disfavoring

restrictive covenants on employment) favor the finding of no liability. Third, Aftermarket has

not demonstrated a protectable interest under trademark or defamation laws. At most,

Aftermarket will be able to successfully allege a few instances of false advertising, the theft of

some trade secrets, and the breach by Hester of his employment contract and fiduciary duties.

These factors, taken together, do not rise to the level of the intentional tort as outlined in

*Hornung*.

## CONCLUSION

For the reasons stated above, the parties' motions for summary judgment and partial

summary judgment are **GRANTED IN PART** and **DENIED IN PART** as outlined below:

Count 1:      The Defendants' motions for summary judgment are **GRANTED**.

Count 2:      The Defendants' motions for summary judgment are **GRANTED**.

---

[30]"From these authorities, it is clear that to prevail a party seeking recovery must show
malice or some significantly wrongful conduct. In Prosser and Keeton on Torts § 130 (W.P.
Keeton ed. 5th ed. 1984), this is stated as follows:
> [T]he [interference] cases have turned almost entirely upon the defendant's motive
> or purpose, and the means by which he has sought to accomplish it....[S]ome
> element of ill will is seldom absent from intentional interference; and if the
> defendant has a legitimate interest to protect, the addition of a spite motive usually
> is not regarded as sufficient to result in liability."
*Hornung*, S.W.2d at 859.

Count 3:    Aftermarket's motion for summary judgment is **GRANTED** as to the flyer
created describing WITT as "formerly" HTP. The Defendants' motion for
summary judgment is **GRANTED** on all other claims arising from Count
3.

Count 4:    The Defendants' motions for summary judgment are **GRANTED**.

Count 5:    The Defendants' motions for summary judgment are **GRANTED**.

Count 6:    The Defendants' motions for summary judgment are **GRANTED**.

Count 7:    The Defendants' motions for summary judgment are **GRANTED** as to the
allegation that Charles Bowman breached his employment contract.
Kenny Hester's motion for summary judgment is **DENIED**.
Aftermarket's motion for summary judgment is **DENIED**.

Count 8:    The Defendants' motions for summary judgment are **GRANTED**.

Count 9:    The Defendants' motions for summary judgment are **GRANTED** except
as to the financial information taken from ATCDG's Charlotte offices.

Count 10:   The North Carolina Defendants' motion for summary judgment is
**GRANTED**. Kenny Hester's motion for summary judgment is **DENIED**.

Count 11:   The Defendants' motions for summary judgment are **GRANTED**.

Count 12:   The Defendants' motions for summary judgment are **GRANTED**.

All motions for summary judgment or partial summary judgment not mentioned above

are **DENIED**. An appropriate order will follow.

This is the 12 day of August, 2003.

Thomas B. Russell, Judge
United States District Court

ENTERED
AUG 1 3 2003
JEFFREY A. APPERSON, CLERK
BY: DEPUTY CLERK

cc: counsel
via
facsimile
& U.S. Mail